Saffell shall bear the costs of this appeal.

AFFIRMED IN PART, VACATED IN PART and REMANDED.

ST. PAUL FIRE AND MARINE INSURANCE CO., Plaintiff-Appellee,

v.

VEST TRANSPORTATION COMPANY, INC., and Victory Towing Company, Inc., Defendants-Appellants,

v.

SWITZERLAND GENERAL INSURANCE CORPORATION of NEW YORK, Defendant-Appellee.

No. 80–3989.

United States Court of Appeals, Fifth Circuit.

Feb. 1, 1982.

---

J. Murray Akers, Greenville, Miss., for defendants-appellants.

John K. Meyer, Houston, Tex., for St. Paul Fire and Marine Ins. Co.

Joaquin Campoy, Randall L. Kleinman, New Orleans, La., for Switzerland Gen. Ins. Corp.

Before BROWN, COLEMAN and RUBIN, Circuit Judges.

PER CURIAM:

The facts in this admiralty case are adequately set forth in the District Court's memorandum opinion, set forth below as an appendix. We fully agree with the decision and rationale of the District Court, except for that portion (Section III below) in which the doctrine of estoppel is held unavailable to create coverage that is excluded by the terms of an insurance policy. Although we express no opinion as to the availability of estoppel in the peculiar facts of this case, we affirm the District Court's finding that there was no detrimental reliance—a necessary precondition for the application of estoppel—upon the representations of Switzerland General Insurance Corporation of New York or its agents. On the basis of the attached opinion, we affirm.

AFFIRMED.

## APPENDIX

KEADY, Chief Judge:

In this admiralty action, the court is called upon to consider policies of marine insurance and to declare the rights and liabilities of the parties arising thereunder. St. Paul Fire & Marine Insurance Company (St. Paul), as plaintiff, seeks declaratory relief for a determination of nonliability on a marine insurance policy issued to defendants, Vest Transportation, Inc. (Vest) and/or Victory Towing, Inc. (Victory), Mississippi corporations domiciled at Greenville, for a casualty occurring on March 5, 1975, when an insured vessel, Barge B–521, collided with a pier of a Mississippi River bridge at Vicksburg. Also joined as a defendant was Switzerland General Insurance Company of New York (Switzerland General), a New York corporation which insured the same vessels as were covered by St. Paul. Vest and Victory counterclaimed against St. Paul and crossclaimed against Switzerland General for damages and attorney fees arising from failing to pay losses under their insurance policies.

The basic facts relating to the casualty may be simply stated. On or about March 5, 1975, the M/V JOHNNY DAN, a vessel owned by Victory, was towing Barge B–521 in a tow of four loaded tank barges upbound on the Mississippi River when Barge B–521 collided with a pier of the Vicksburg Railroad and Highway Bridge spanning the Mississippi River at approximately Mile 435.8 at Vicksburg. As a result of this casualty, one crew member of the M/V JOHNNY DAN lost his life, another was injured, and about one-third of the cargo of crude oil in tow escaped in the river. Most significant here is that Barge B–521 was wrecked on a pier and subsequently sank. The parties have stipulated that the sinking of the barge was caused by fault on the part of M/V JOHNNY DAN, whose crew members were employed by Victory, and not by the unseaworthiness of Barge B–521, negligence in her maintenance or operation, or other fault on the part of the barge, a dumb vessel without crew or motive power of its own. Vest and/or Victory, with the concurrence of the underwriters, abandoned the wrecked barge to the government. Subsequently the United States incurred expenses of $393,936.28 in removing the wreck of the barge and brought suit against Vest and Victory for these and related expenses. On September 29, 1978, a consent judgment was entered against Vest and Victory, but without prejudice to the rights or defenses held by St. Paul or Switzerland General under their insurance policies.[1]

St. Paul seeks a declaration that the claim for the expense of removal of the wreck of the barge does not fall within the coverage afforded by its policy to Vest and/or Victory; in the alternative, it contends that, should there be coverage, such coverage must be limited to Victory as tug owner and not as barge owner, and that therefore the insurance underlying St. Paul's excess coverage is more than adequate to satisfy the government's judgment.

The position of Switzerland General is basically that, like St. Paul's marine policy, its policy provides no indemnity for expenses of removal of the wrecked barge; in the alternative, Switzerland General asserts that if Victory, and not Vest, was the owner of the barge, and should there be coverage, its coverage to Victory as barge owner is limited to $234,000, the amount of its excess coverage on the barge.

Vest and Victory contend that Victory was the owner of the barge, or at least Victory was the bareboat charterer of the barge and therefore the owner, pro hac vice. Vest and Victory next contend that they were engaged in a joint enterprise so that the negligence of Victory, as owner of M/V JOHNNY DAN, is attributable to Vest as the owner of the barge. Alternatively, Vest and Victory contend that, even if neither insured was covered under the policies, Switzerland General is estopped

1. This consent judgment entered in consolidated causes GC 75–84–S and GC 78–50–S adjudicated the government to be entitled to a total recovery of $429,136.28 consisting of expenses of removal of wreck of Barge B–521 in the amount of $393,936.28; $25,200 for expenses of cleaning up oil pollution; and $10,000 pollution expense. The pollution items totaling $35,200 are not involved in the present controversy. Judgment for the entire sum was entered against both Vest and Victory. Prior to entry of the consent decree, St. Paul and Switzerland General moved to intervene in the proceedings, asserting defenses to the government's claim for the expense of removal of the wrecked barge and maintaining nonliability for such loss under the terms of their respective insurance policies. The consent judgment expressly provided that it would have no effect "by way of res judicata, estoppel, estoppel by judgment or otherwise, on any rights or defenses which Switzerland General ... or St. Paul ... or any of their agents or representatives may have under any policy of insurance issued to Vest and/or Victory ... their owners ... and said judgment shall have no evidentiary value or effect whatever in any pending or future claim or action involving said policies." The consent judgment has been paid by Vest and Victory with contribution from their primary protection and indemnity carrier, American Motorist Insurance Company. In this action, Vest and Victory seek to recover from St. Paul and Switzerland General, excess P&I carriers, their net loss plus interest, punitive damages and attorney fees for breach of contract. The excess insurers have stipulated that the amount paid under the consent judgment to settle the claims of the United States for the expense of removal of the wreck was reasonable.

from denying liability for the expenses of removal of the wreck of the barge because of its conduct and actions taken after the casualty which were detrimentally relied upon by Vest and Victory.

At the outset it should be noted that Victory and Vest were family-held, sister corporations,[2] and the entire stock of each company was owned by Carl D. Vest and his wife, Ora Vest. Carl D. Vest was president of both corporations, his wife the secretary, and his brother, Oscar J. Vest, the treasurer. Prior to 1972, Vest owned M/V DOUBLE D and several oil tank barges, and Victory owned M/V JOHNNY DAN. Separate books were kept for each corporation, although corporate minutes were not always maintained. On occasions funds were loaned from one corporation to the other. Carl D. Vest on July 10, 1972, contracted with Dixie Carriers, Inc. of Houston, Texas, to purchase four steel tank barges, including Barge B–521, and bills of sale were obtained from Dixie Carriers to the barges in favor of Vest. Each of the barges was enrolled in the name of Vest as owner. Vest executed an affreightment contract with Dixie Carriers for the transportation of crude oil in the four barges. On July 10, 1972, Vest executed a fleet ship mortgage on the four barges to Dixie Carriers securing an indebtedness of $286,650 payable in monthly installments with balance maturing October 11, 1975. On the same date Victory executed a separate ship mortgage on M/V JOHNNY DAN to Dixie Carriers securing payment of the same indebtedness.

Since 1969 Carl Vest placed marine insurance for both Vest and Victory with Bill Andrews Agency, Inc. of Greenville, which had authority to bind Argonaut Insurance Company for hull coverage. Andrews contacted Gulf Coast Marine, Inc. of New Orleans, marine insurance brokers, to procure primary and excess protection and indemnity (P&I) coverages. Gulf Coast Marine obtained insurance for the primary coverage as well as first and second layers of excess coverage as set forth below. Andrews was first advised that Barge B–521 was owned by Vest. On January 29, 1975, Andrews was told by Carl D. Vest's secretary, Ann Cox, that it was Victory which owned Barge B–521, and was directed to draw a premium financing contract obligating Victory to pay the premiums on the hull and P&I coverages on Barge B–521. After further investigation, Andrews on February 24, 1975, notified Gulf Coast Marine (GCM) that the P&I policies should be endorsed to show Victory as the insured, or as an additional insured, of the barge. GCM had authority to bind the primary insurer, but not the two excess insurers.

The insurance policies which Vest and Victory had in effect on the date of the casualty may be summarized as follows:

1. A hull policy issued by Argonaut Insurance Company on M/V JOHNNY DAN for $200,000 and on Barge B–521 for $84,000. Argonaut's policy, which also covered other vessels, originally listed Vest as the insured, and on March 4, 1975, Victory was listed as an additional assured with respect to the four tank barges, including B–521.

2. A P&I policy issued by American Motorists for $100,000 primary coverage on the M/V JOHNNY DAN and $100,000 primary coverage on Barge B–521. This policy, which also covered other vessels, originally named Vest as the assured. Effective January 1, 1975, the name of the assured with respect to the M/V JOHNNY DAN and four barges, including B–521, was changed to Victory by endorsement of GCM.

3. A first "layer" of excess P&I coverage issued by Switzerland General insured M/V JOHNNY DAN for $550,000 in excess of $100,000 and Barge B–521 for $234,000 in excess of $100,000. This policy, also insuring other vessels, named Vest as the assured. Unlike the primary and second layer of excess coverage, Switzerland General's policy was never endorsed to provide that the name of the insured with respect to

---

**2.** Vest and Victory as of September-October 1978 ceased to do business and have been dissolved as corporate entities.

four oil barges, including B–521, was Victory. GCM's agent claimed he notified G & M Marine, Inc., agent with authority to bind Switzerland General, concerning need to endorse policy in favor of Victory. G & M, however, denies receiving such notification.[3]

4. A second "layer" of excess P&I coverage issued by St. Paul on M/V JOHNNY DAN for $250,000 in excess of the primary and first layer of P&I coverages ($650,000) and on Barge B–521 $250,000 in excess of $334,000 primary and first layer of P&I coverage. St. Paul's policy, which covered the other vessels, named both Vest and Victory as the assureds.

Each P&I policy had incorporated into its provisions a special risks form known as SP–23,[4] which provides that the insurer

> undertakes to make good to the Assured . . . all such loss and/or damage and/or expense as the Assured shall *as owners of the vessel named herein* have become liable to pay and shall pay on account of the liabilities, risks, events and/or happenings herein set forth:
>
> .      .      .      .      .
>
> (7) Liability for cost or expense of, or incidental to, the removal of the wreck *of the vessel named herein* when such removal is compulsory by law . . . .[5] (Emphasis added).

Each P&I insurance policy listed by name specific vessels and contained a clause stating "each vessel deemed a separate insurance."

Three issues emerge from the evidence. First, did Vest or Victory own Barge B–521; if Vest owned the barge, then was the relationship between Vest and Victory such that Vest could become liable for Victory's negligence, i.e., was Victory either the bareboat charterer of the barge or was it engaged with Victory in a joint venture at the time of the casualty so as to impute Victory's negligence to Vest? Second, do the excess policies apply to indemnify the barge owner—whether Vest, Victory or both—for the expense of removal of the wreck of the barge? Third, apart from policy provisions, is Switzerland General estopped from denying coverage to Vest and/or Victory for indemnifying expenses incurred by the government for removal of the wreck?[6]

## I. WHO OWNED THE BARGE: VEST OR VICTORY?

### (It doesn't really matter)

A factual dispute arises. as to the ownership of Barge B–521 largely because of the confused and contradictory state of the record, for which Vest and Victory are chiefly, if not solely, responsible. As previously stated, the four tank barges, including B–521, were acquired and enrolled in the name of Vest, which executed a fleet ship mortgage on the barges to secure the payment of their purchase price and an affreightment contract for transporting crude oil in the barges. Despite these facts, Carl D. Vest stated, in deposition testimony, that he

---

3. Switzerland General claims that the endorsement on the primary policy by GCM could not be effective to bind it since by ¶ 6 of its policy "no changes shall be made in the Primary Policy which have the effect of broadening the insuring conditions thereof." For reasons which later appear, we deem this issue to be of no relevance.

4. Argonaut's hull policy, however, contained an SP–39C form which clearly excluded coverage for liability for wreck removal expense, as it stipulated "provided always that this clause shall in no case extend to any sum . . . for a removal . . . of obstructions or wrecks."

5. The SP–23 form was incorporated by reference in the certificate of insurance applicable to American Motorists Policy OM 14318. The

original policy was not produced, but all parties agree that the first and second layers of excess coverage cover the same risks.

6. Vest and Victory, in their brief, contend that St. Paul is also estopped. Not only is this contention unsupported by the evidence, but also Vest and Victory did not plead estoppel as an affirmative defense to St. Paul's complaint as required under Rule 8(c), F.R.Civ.P. Neither was this listed as an issue in the agreed pretrial order. From the inception of the case, the claim of estoppel has been invoked by Vest and Victory only against Switzerland General. Thus, we conclude that, if applicable at all, estoppel may be invoked only against Switzerland General.

intended for Dixie Carriers to transfer the barges to Victory since it was his purpose for Victory to make the purchase and to use them exclusively in servicing the affreightment contract with Victory's M/V JOHNNY DAN. Mr. Vest testified, without contradiction, that Victory received all income earned under the affreightment contract, that Victory, and not Vest, made all payments on the purchase price of the four barges, including B–521, and Victory took depreciation on the barges and claimed investment tax credit on its income tax returns.

Mr. Vest acknowledged, however, that from the time the barges were acquired on July 10, 1972, he was aware that the bills of sale and other documents showed the title to Barge B–521 to be in Vest and that he never made any effort to transfer title or record ownership to Victory. Although Mr. Vest was unable to recall what information he originally gave Andrews, his insurance agent, concerning the ownership of the barges, Andrews definitely testified that Mr. Vest specifically informed him in July 1972 that Barge B–521 belonged to Vest, and the original hull policy was issued accordingly. As previously stated, it was not until January 29, 1975, that Andrews had any information that Barge B–521 should be insured to Victory. It was this information which caused Andrews to seek endorsements showing Victory as the insured or an additional insured.

Of particular significance in resolving the factual issue of ownership are the actions taken after the casualty by Carl D. Vest on behalf of both Vest and Victory. On April 22, 1975—48 days after the casualty—Victory filed in this federal district court a limitation proceeding, GC 75–50–S, sworn to by Carl D. Vest as president, stating that the four tank barges, including B–521, in the tow of the M/V JOHNNY DAN at the time of the casualty were owned by Vest.[7] On September 5, 1975, Vest filed in this court a limitation proceeding, GC 75–116–S, alleging that Vest was the owner of Barge B–521, as well as the other three tank barges in the tow of the M/V JOHNNY DAN at the time of the casualty.[8] Finally, on October 7, 1975, Vest filed a claim and a contingent claim against Victory in the latter's limitation proceeding asserting that certain claims on behalf of the United States had been made against Vest as owner of Barge B–521 resulting from the casualty and also that Vest itself had sustained damages of approximately $125,000 caused by collision to Barge B–521 and its other barges in the tow of the M/V JOHNNY DAN. Vest, as claimant, prayed that its claim and contingent claim be established against Victory in case the latter was held not entitled to exoneration from liability for the collision.

We agree that a ship's documentation of title, while prima facie evidence of ownership, is not conclusive and that true ownership of a vessel is not dependent upon its registry. *Meacham Corp. v. United States*, 207 F.2d 535, 543–47 (4 Cir. 1953), *cert. dism'd*, 348 U.S. 801, 75 S.Ct. 17, 99 L.Ed. 633 (1954); *see Southern Bell Tel. & Tel. Co. v. Burke*, 62 F.2d 1015, 1016 (5 Cir. 1933). The question of ownership of a vessel is ordinarily governed by state law. *See Stewart & Co. v. Rivara*, 274 U.S. 614, 618, 47 S.Ct. 718, 720, 71 L.Ed. 1234 (1927). Victory argues that the court should infer that a resulting trust in favor of Victory arose when the barge was transferred to Vest and the purchase price was thereafter paid by Victory. In *Stevens v. Hill*, 236 So.2d 430, 433 (Miss.1970), the Mississippi Supreme Court recognized the general rule

---

7. Victory's limitation proceeding averred that the net cash value of Victory's interest in the M/V JOHNNY DAN, exclusive of mortgage balance owing to Dixie Carriers, did not exceed the sum of $62,000, and upon filing bond in that amount prayed that Victory and the M/V JOHNNY DAN be exonerated from liability or in the alternative that Victory's liability be limited to its $62,000 interest in the towing vessel.

8. Vest's petition, which alleged various losses and claims arising as a result of the collision, stated that the residual value of Barge B–521 did not exceed $1,000 and upon filing a $1,000 bond sought exoneration and/or limitation of liability to Vest and the barge to the extent of the barge's stated value at the termination of the voyage.

that a presumption or inference of a trust results under certain circumstances. However, that presumption should not apply where, as here, the transferee, Vest, simultaneously executed a purchase price mortgage on the property so conveyed and immediately entered into a contract which produced the income to pay the purchase price of the property so conveyed. Thus, any inference that Victory intended to acquire beneficial ownership of Barge B–521 is dispelled by such evidence. Moreover, the position taken by Victory which acknowledged ownership of the barge to be in Vest and the position taken by Vest which not only affirmatively asserted ownership of the barge but claimed liability against Victory because of damage to its barge negate any presumption that Vest ever intended to hold title to the barge in trust for Victory. Although judicial estoppel may not technically be applicable because the excess insurers were not parties "adverse in the original [limitation] proceedings," *Thomas v. Bailey,* 375 So.2d 1049, 1053 (Miss.1979), the present assertion by Vest and Victory of positions wholly contradictory with those maintained by them in prior litigation in this court, and from which they received the benefit of judicial relief, reinforces our conclusion that Vest, not Victory, was the barge owner.

We briefly examine the Vest/Victory alternative contention that at the time of the casualty Victory was the bareboat charterer of B–521, and hence owner pro hac vice. Although there is no evidence that an express agreement existed between Vest and Victory of charter or other arrangement for Victory's use of the barge, a charter party may be implied from circumstances concerning the actual possession and use of a vessel. A "bareboat" or demise charter requires "[a] complete transfer of possession, command, and navigation of the vessel from the owner to the charterer." *Gaspard v. Diamond M. Drilling Co.,* 593 F.2d 605, 606 (5 Cir. 1979). Such an agreement need not be in writing, and a demise is "tantamount to, though just short of, an outright transfer of ownership." *Guzman v. Pichirilo,* 369 U.S. 698, 700, 82 S.Ct. 1095, 1096, 8 L.Ed.2d 205, 208 (1962). Under the evidence, it is certainly reasonable to imply that a bareboat charter of Barge B–521 existed in favor of Victory. From the time of its acquisition, B–521 and three other tank barges were placed in the tow of Victory's M/V JOHNNY DAN, and Victory at all times exercised sole control and command over the barge, since it was Victory's employees who directed the navigation. Vest retained no possession, nor did it exercise any control whatsoever over its barge. Moreover, Victory's allocation of a portion of the income derived from service of the barge to pay its purchase price inured to the benefit of Vest and may be deemed as the consideration, or charter hire, paid by Victory for use of the barge. This factual conclusion renders it unnecessary for us to consider Vest/Victory's second alternative contention that the two corporations were acting as one, or were engaged in a joint venture.[9]

9. We do note, however, that Vest and Victory chose corporate forms for doing business and for the acquisition of property with which to carry on business operations. It is, of course, impermissible for corporate stockholders to have availed themselves of corporate structures of separate corporations when their interests were served but to discard them when it becomes no longer advantageous. Under well-settled principles, the corporate veil will be pierced only to avoid fraud or to defeat public or private rights. The Fifth Circuit has often spoken on this subject. "Courts are reluctant to pierce the corporate veil and destroy the important fiction under which so much of the business of the country is conducted, and will do so only under such compelling circumstances as require such action to avoid protecting fraud, or defeating public or private rights." *Maule Industries v. Gerstel,* 232 F.2d 294, 297 (5 Cir. 1956) (quoted in *Maley v. Carroll,* 381 F.2d 147, 155 (5 Cir. 1967)). *See also Johnson & Higgins of Miss. Inc. v. Commissioner of Insurance,* 321 So.2d 281, 284–85 (Miss.1975). Just recently the Fifth Circuit in *Homan & Crimen, Inc. v. Harris,* 626 F.2d 1201 (5 Cir. 1980), stated:

We recognize of course that the corporate entity may and should be disregarded "in such cases as fraud, violation of law or contract, public wrong, or to work out the equities among members of the corporate internally." 1 W. Fletcher, Cyclopedia of the Law of Private Corporations § 25, at p. 99 (rev.

Despite the above findings, we conclude that even if we accept Vest/Victory's contention that Victory owned the barge either wholly or as a charterer pro hac vice, nevertheless the provisions of the P&I policies—primary as well as excess—do not apply to indemnify the barge owner, whichever corporation it may be, for wreck removal expenses because of the undisputed facts concerning the accident which brought about the wreck of B–521.

## II. DO THE P&I POLICIES COVER THE EXPENSE OF WRECK REMOVAL?

Our analysis must begin with an interpretation of § 15 of the Rivers & Harbors Appropriation Act, 33 U.S.C. § 409, frequently referred to as the Wreck Act. That statute provides, in relevant part:

> [W]henever a vessel ... is wrecked and sunk in a navigable channel, accidentally or otherwise, it shall be the duty ... of the owner of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently and failure to do so shall be considered as an abandonment of such craft, and subject the same to removal by the United States ....

It was previously thought that this 1899 statute authorized the government only to an *in rem* judgment against the wreck to offset its removal expenses. In 1967, however, the United States Supreme Court, in *Wyandotte Transportation Co. v. United States*, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967), held that an *in personam* judgment for the cost of removal could be rendered in favor of the government against the person who negligently or intentionally caused the sinking. *Wyandotte* left unresolved the question of whether an *in personam* action could lie against the non-negligent owner of a sunken vessel. Subsequent decisions, however, have made it clear that although a non-negligent owner has a statutory duty to remove the sunken vessel or abandon it, such an owner cannot be held personally liable for the government's cost of removing the sunken vessel. *Tennessee Valley Sand & Gravel Co. v. M/V DELTA*, 598 F.2d 930, 934 (5 Cir. 1979); *United States v. Raven*, 500 F.2d 728, 733 (5 Cir. 1974), *cert. denied*, 419 U.S. 1124, 95 S.Ct. 809, 42 L.Ed.2d 824 (1975); *see University of Texas Medical Branch v. United States*, 557 F.2d 438 (5 Cir. 1977), *cert. denied*, 439 U.S. 820, 99 S.Ct. 84, 58 L.Ed.2d 111 (1978). An excellent summary of the law was made by Circuit Judge Rubin in *Tennessee Valley Sand & Gravel Co., supra*, where the court stated:

> The owner of a vessel sunk without any negligence on his part is still subject to the statutory obligation to remove the wreck, *see, e.g., University of Texas Branch at Galveston v. United States*, 5 Cir. 1977, 557 F.2d 438, 448, but is given an option: he may either raise the vessel himself and seek recovery of the expenses from the party responsible for the sinking, *In re Chinese Maritime Trust, Ltd.*, 2 Cir. 1973, 478 F.2d 1357, 1361 n.5, *cert. denied*, 1974, 414 U.S. 1143, 94 S.Ct. 894, 39 L.Ed.2d 98, or he may abandon the vessel and allow the United States to bear the burden of removal and recovery of expenses from the negligent party. *United States v. Cargill, Inc., supra*, 367 F.2d [971] at 978. If the non-negligent owner exercises his right to abandon, he is liable neither for the cost of removal nor for damages suffered by third parties as a result of the wreck. *See, e.g., Lane v. United States, supra*, 529 F.2d [175] at 177 n.2; *United States v. Raven*, 5 Cir. 1974, 500 F.2d 728, 733, *cert. denied*, 419 U.S. 1124, 95 S.Ct. 809, 42 L.Ed.2d 824; *In re Marine Leasing Services, Inc.*, 5 Cir. 1973, 471 F.2d 255, 257.
>
> Thus, it is clear beyond peradventure that the owner of Barge B–521 was not legally liable to the United States for the expense of removing the wrecked barge since it is stipulated that the sinking was caused solely by the negligence of the towing vessel, JOHNNY DAN, and that the

perm. ed. 1974). None of these circumstances are sufficiently present here ....

*Id.* at 1208.

barge was innocent of any wrongdoing. It is equally clear that Victory, as the negligent owner of the towing vessel, would be personally liable to the government for the cost of removal of the sunken vessel as a hazard to navigation unless Victory itself promptly removed the barge. Therefore the essential question is whether this liability on the part of Victory is one which is covered by the P&I policies. The interpretation of a policy of marine insurance is, of course, entirely a matter of federal, and not state, law.

It must be stressed initially that protection and indemnity policies do not purport to cover all types of an insured's liability but extend only to the liabilities specifically enumerated in the insuring agreement. This is manifestly clear from the terms of the three P&I policies involved in this case. The SP–23 form lists fourteen specific types of loss or damage as perils or risks insured against; these enumerated perils by no means would cover the entire range of a shipowner's liability. One of the specific perils insured against, as contained in ¶ 7 of the policy, is liability for cost or expenses of the wreck of the insured vessel when such removal is compulsory by law. No other portion of the P&I policies is here relevant.

As previously noted, the P&I policies contain the following critical provisions:

> The assurer hereby undertakes to make good to the assured all such loss and/or damage and/or expense as the assured shall *as owners of the vessel named herein* have become liable to pay and shall pay on account of the liabilities, risks, events, and/or happenings herein set forth:

> .        .        .        .        .

> (7) Liability for cost or expenses of, or incidental to, the removal of the wreck of the *vessel named herein when such removal is compulsory by law.* (Emphasis added).

Each was a fleet policy, which insured both tugs and barges in varying amounts, and provided that "each vessel deemed a separate insurance." In light of these policy provisions and the settled rules of maritime law, St. Paul and Switzerland General contend that their policies indemnify only the liability of the owner of the sunken vessel for the cost of removal of that vessel and that such liability arises only if the owner of the vessel, the sunken barge in this case, is negligent *as owner* of such vessel. They also contend that since Victory was liable only as owner of the negligent tug, and not as owner of the innocent barge, their policies do not cover the cost of wreck removal. St. Paul advances with metaphorical accuracy the "two hat theory"—*i.e.*, that, for liability to exist, the insured must, at the time of the casualty, be wearing the barge owner's hat, and not the tug owner's hat. It thus becomes clear that if St. Paul and Switzerland General are correct in this contention, the ownership of the barge, whether Vest, Victory, or both of them, becomes immaterial since the policies provide coverage only for the liability of an assured as owner of the sunken vessel for which indemnification of removal expense is sought.

Settled case law supports the limited contours of liability coverage arising from marine insurance policies which clearly emphasize, as does SP–23, that indemnification extends to the assured only "as owner of the vessel named herein" for a cost or expense of "removal of the wreck of the vessel named herein" and states, "each vessel deemed a separate insurance." These explicit policy provisions leave no room for doubt or ambiguity as to who is the insured, in what capacity he is insured, and for which losses he will be indemnified. It would therefore be improper to construe these policy provisions in favor of an assured's position under the rubric of affording him the benefit of resolving doubtful coverage against the insurer. The rationale of the Fifth Circuit in *THE FANNY D*, 112 F.2d 347 (5 Cir. 1940), a case relied upon by Vest and Victory, simply does not fit the present case.

In *THE FANNY D*, a barge in tow of THE FANNY D collided with a steamship moored to a dock in the Houston harbor. Both tug and barge were owned by Eggers. The barge was loaded with cargo under an

affreightment contract made with Eggers, who was himself acting as master and pilot of the tug. The barge was without motive power, steering gear, and had no crew. The steamship company filed a libel *in rem* against tug and barge and *in personam* against Eggers. Eggers, denying negligence, claimed the barge and tug separately as owner and they were released to him on stipulation. The barge was covered "by a protection and indemnity policy in the usual form," and the tug was not insured at all. *Id.* at 348. Eggers sought declaratory judgment against the insurer to establish liability. The district court found the tug solely at fault and entered a decree against the tug and Eggers *in personam*; the libel against the barge was dismissed, and declaratory judgment was entered against Eggers in favor of the barge insurer. Reversing the district court in its ruling on the declaratory judgment, the Fifth Circuit construed the policy to mean

> if the insured vessel collided with another ship, causing damage to her for which the assured was held liable, the underwriter would reimburse him for what he would pay .... To give the policy the interpretation contended for by the insurance company we would have to read into the full collision clause "provided the insured vessel is herself at fault," or words to that effect. Insurance policies that are vague or ambiguous are to be construed against the underwriter. If it had been the intention of the parties to restrict the coverage of the policy to cases in which the insured vessel was herself at fault it would have been very easy to have written it in instead of leaving it to be inferred by a constrained construction. Eggers, the "assured," was the beneficiary and not the barge. We construe the policy to be broad enough to cover personal liability of Eggers resulting from the collision, regardless of whether the barge would be held responsible in rem.[10]

*Id.* at 350.

10. *THE FANNY D* must be read as rejecting the state court decision of Barge NORMAN KELLY, 1923 AMC 959 (Ohio Ct.App.1923),·

The words which the Fifth Circuit in *THE FANNY D* found to be missing were not long in being supplied in the marine insurance industry. *See Driftwood Lands and Timber Ltd. v. United States Fire Ins. Co.,* 1955 AMC 884, 886–90 (S.Ct. Ontario, Can. 1954).

The consensus of the federal cases, unanimous so far as our research reveals, is that in P&I protection afforded by underwriters under terms or language similar to SP–23 the assured must be liable as owner of the insured vessel; liability in any other capacity is irrelevant, as is the question of whether the same person is the owner of the insured innocent vessel and the negligent vessel. Settled case law supports these propositions.

In *Harbor Towing Corp. v. Atlanta Mutual Ins. Co.,* 189 F.2d 409 (4 Cir. 1951), the court construed a policy of marine insurance which covered a barge owned by the same corporation that owned the tug. The barge was insured for collision under a "run down" clause. The barge collided with a motor vessel, causing loss which was due solely to the fault of the tug. The tug owner, after paying judgment for the damages, sued the insurer of the barge under a policy providing as follows:

> [I]f the vessel hereby insured shall come into collision with any other Ship or Vessel and the Assured or the Charterers in consequence thereof ... shall become liable to pay and shall pay by way of damages to any other person or persons any sum or sums in respect of such collision, we, the Underwriters, will pay the Assured or Charterers, such proportion of such sum or sums so paid as our respective subscriptions hereto bear to the value of the vessel hereby insured. *Id.* at 410, n.1.

In construing this clause, the court stated: "[i]t becomes clear, when all the terms of the collision clause are borne in mind, that the parties intended to safeguard the owner against the consequences of a collision in

which construed policy provisions practically identical with those in *THE FANNY D* in favor of the insurer.

which his vessel was at fault." *Id.* at 411–12. Furthermore:

the policy covers the barge and no other vessel, and ... the first paragraph of the running down clause relates to liability falling upon the owner on account of the vessel's action. One does not associate liability with blameless conduct and so without more it would not be unreasonable to adopt the company's interpretation.

*Id.* at 412. Thus, the court concluded "that the indemnification furnished by the underwriter in this policy in suit to the owner of the barge is confined to protection from the vessel's misdeed." *Id.*

The Fifth Circuit in two recent cases, *Lanasse v. Travelers Ins. Co.*, 450 F.2d 580 (5 Cir. 1971), *cert. denied sub nom., Chevron Oil Co. v. Royal Ins. Co.*, 406 U.S. 921, 92 S.Ct. 1779, 32 L.Ed.2d 120 (1972), and *Wedlock v. Gulf Miss. Marine Corp.*, 554 F.2d 240 (5 Cir. 1977), has been most instructive in construing P&I coverages. In *Lanasse*, a seaman/employee of Cheramie on an offshore rig, owned by Cheramie but operated by Chevron as time charterer, was injured solely because of the negligence of Chevron's crane operator. Cheramie sought and obtained exoneration against Chevron for the full amount paid to settle the claim of the injured seaman. Chevron relied upon indemnification provisions of the P&I policy which named it as an additional insured. The court held that the policy did not apply, saying:

The vessel [the offshore rig owned by Cheramie] and her crew were, on the one hand, absolved from all wrong or unseaworthiness. Chevron, on the other hand, was found at fault for the manner in which the crane was operated. The vessel offered nothing further than a condition or locale for the accident.

There must be at least some causal operational relation between the vessel and the resulting injury. The line may be a wavy one between coverage and noncoverage, especially with industrial complications in these ambiguous amphibious operations plus those arising from the personification of the vessel as an actor in a suit in rem. But where injury is done through nonvessel operations, the vessel must be more than the inert locale of the injury. Nothing more occurred here, for it was Chevron's actions as a platform operator or as a crane operator that caused the harm, and that does not make it a liability of a shipowner.

*Id.* at 584.

In *Wedlock, supra,* McDermott, the barge owner, chartered a tug and its crew to tow the barge. An employee of the tug was injured on the barge. McDermott settled with the injured employee and sought indemnification under a P&I policy on the tug naming him as an additional insured. The policy did not list the barge as a covered vessel. The court held that "the insurance policy does not purport to cover McDermott's liability for acts of negligence committed *qua* barge-owner, rather than *qua* charterer." *Id.* at 242. *Lanasse* was specifically approved in the court's interpretation of the insurance policy.

*Lanasse,* however, establishes only that showing "some causal relation" brings the liability within the insurance policy on the covered vessel. It does not address the question of the extent of such coverage. It is entirely consistent with *Lanasse* to say that *the insurance policy covers liability arising from the accident only to the extent the accident is caused by the covered vessel.*

In *Lanasse,* the vessel caused no part of the injury; hence the charterer was unable to recover as an additional assured and bore the full cost of the accident. In the case at bar, negligence of the tug's crew was one of two proximate causes of the accident, and hence we should require the tug's insurer to bear some but not all of the loss. We leave the cost of the accident to be shared by the tug-owner and barge-owner in the amount of their respective contributions. *Lanasse,* after all, emphasizes that Chevron could not recover from the insurer of the tug because Chevron's liability arose *qua* plat-

form operator rather than *qua* shipowner (or charterer). Similarly, McDermott's liability arose as that of a barge-owner, not as an owner or charterer of the covered vessel.

*Id.* at 244 (emphasis added).

It is insignificant that the P&I policy in *Wedlock* covered the tug and not the barge, for under the policy in the case sub judice, each vessel, though grouped or listed in a fleet policy, must be deemed to be "a separate insurance," i.e., as if written in a separate insurance policy. These words, to our mind, are incapable of having any different meaning.

A district court decision involving P&I coverage containing clauses very similar, if not identical, to those involved herein, and, incidentally, written by American Motorists Insurance Company and St. Paul Fire & Marine Insurance Company as primary and excess carriers, is *American Motorists Ins. Co. v. American Employers' Ins.,* 447 F.Supp. 1314 (W.D.La.1978), *remanded on other grounds,* 600 F.2d 15 (5 Cir. 1979). The facts of the case are most striking. Jack Trahan was shot with a pistol fired by Donald Kelly, a member of the crew of M/V LAP I, a tug owned by Lafayette Crew Boats, Inc. At the time of the shooting, Kelly had docked the M/V LAP I for refueling and had proceeded, with his pistol, to the petroleum distributor's office. While in the office, Kelly leaned out of the window and fired three shots, one of which ricocheted off a bottle and struck the hapless Trahan. Trahan filed suit against Lafayette, which made demand upon its three carriers, American Employers, American Motorists, and St. Paul. All three insurers proceeded to escrow funds on behalf of Lafayette for the purpose of settling Trahan's claim, and reserved to each other the issue of policy coverage. The two P&I carriers sued American Employers, the comprehensive general liability carrier, for declaration as to non-coverage.

Applying the rationale of *Lanasse,* District Judge Veron held that the preamble provisions of the P&I policies[11] issued to Lafayette expressed an unmistakably clear intention to protect Lafayette only for losses suffered in its capacity as vessel owner and not in its capacity as Kelly's employer, who might be vicariously liable for his tortious conduct.

Vest/Victory urge that under the "flotilla doctrine," the M/V JOHNNY DAN and the Barge B–521 must be viewed as one vessel, notwithstanding the express contrary language of the insurance policies, and they rely upon *Sacramento Navigation Co. v. Salz,* 273 U.S. 326, 47 S.Ct. 368, 71 L.Ed. 663 (1927). But as the Supreme Court made clear in *Salz,* the flotilla rule applies only in contractual claims, such as a suit for loss of cargo under the Harter Act, 46 U.S.C. § 190 et seq., and not to tort claims. This distinction was explicitly drawn in *Liverpool, Brazil & River Plate Steam Navigation Co. v. Brooklyn Eastern District Terminal,* 251 U.S. 48, 40 S.Ct. 66, 64 L.Ed. 130 (1919), and adhered to in *Harbor Towing, supra,* at 414, and *In re American Commercial Lines, Inc.,* 353 F.Supp. 872, 874 (E.D.Ky.1973). Though contractual relations exist between Vest/Victory and the P&I underwriters, the policy provisions are not applicable unless there is an underlying liability for negligence.

Vest and Victory contend that to allow underwriters to create a "legal fiction" between liability as tug owner and liability as barge owner, under conditions when the innocent barge is sunk and becomes a hazard to navigation as a result of the negligent tug, would be against public policy and subvert the Wreck Act, 33 U.S.C. § 409. However, as we have previously noted, all of the authorities flatly refute this assertion. Although the case sub judice appears to be the first in which demand

---

11. That preamble provided:

The Assurer hereby undertakes to make good to the assured or the assured's executors, administrators and/or successors, all such loss and/or damage and/or expense as the assured shall as owners of the vessel named herein have become liable to pay on account of the liabilities, risks, events, and/or happenings herein set forth.

*Id.* at 1318.

is made by the owner of an innocent sunken vessel to indemnify its payment of the government's removal costs, it is clear that the P&I policy provisions were undoubtedly inserted by the marine insurance industry for the purpose of limiting its liability to indemnify the assured as owner of the vessel and, with respect to the cost of removal, liability as owner of the sunken vessel. It is not the task of courts to reform or re-write insurance policies on the notion that under all circumstances, irrespective of plain policy provisions, the insured is enti-tled to indemnity. In short, these policies provided for removal of a wrecked vessel only if the owner was liable as owner of the wrecked vessel. Here, the removal of the barge was covered, but there was no liabili-ty, and although there was liability on the part of the tug, there was no coverage since it was not the wrecked vessel. We there-fore hold that the P&I coverages afforded by St. Paul and Switzerland General as excess carriers did not provide indemnity for the wreck removal expenses sustained by Vest/Victory as owner of the negligent tug.

## III. IS SWITZERLAND GENERAL ES-TOPPED TO DENY "APPLICABILI-TY" OF THE COVERAGE?

A distinctive issue arises as to whether Switzerland General is estopped from deny-ing responsibility for the removal cost of the wrecked barge because of its acts and representations of its agents subsequent to the casualty.

The parties' attorneys are the leading characters involved in this issue. Lawrence D. Wade, an experienced Greenville admi-ralty lawyer, assisted by his associate Claude L. Stuart, III, represented Vest/Victory, the primary P&I carrier, and the hull underwriter. Lester F. Lauten-

schlaeger, a member of a prominent New Orleans admiralty law firm, represented Switzerland General and had direct contacts with its general agents.

Within hours after the accident, Wade informed Lautenschlaeger of the death, personal injury and cargo claims arising from the collision and also of the fact that Barge B–521 was holed and partially sunk against a pier of the Vicksburg Bridge, thus posing a hazard to navigation in the Missis-sippi River as well as a peril to a nearby interstate highway bridge. On the basis of this initial information, Lautenschlaeger made a file memorandum stating "no doubt our layer to be invaded." [12] Wade and Lau-tenschlaeger realized that the United States Corps of Engineers and the Coast Guard would require prompt removal of the wrecked barge. Within several days after the casualty, hull underwriters advised the parties that they had no interest in reclaim-ing Barge B–521 and deemed it a construc-tive total loss. Wade and Vest/Victory knew it was undesirable to attempt removal of the wrecked barge in high water and swift current conditions; they preferred to defer removal until the summer months when river conditions would be more favor-able. Commencing in the latter part of March, Wade maintained regular telephone communication with Lautenschlaeger and kept him advised of the status of dealings with the Corps of Engineers regarding the removal of the wrecked barge. The Corps' position was that the barge should be re-moved as speedily as possible, and it applied pressure upon Vest/Victory to accomplish the removal forthwith. Lautenschlaeger and Wade agreed that it would most likely be less expensive for private salvors to re-move the wreck on a no cure-no pay basis than to allow the government to undertake the task. [13] Because of the insistence of the Corps of Engineers that removal be accom-

---

**12.** Wade also had telephone conversations with John K. Meyer, attorney of Houston, Texas, representing St. Paul, but the nature of these conversations was no more than general, such as informing Meyer of the course of action being taken by Vest/Victory, the hull under-writers, the primary P&I carrier, and Switzer-land General as the first excess carrier.

**13.** Experience has shown that the govern-ment's cost of removal, due to the nature of things, is more expensive than private effort. See *Tennessee Valley Sand & Gravel, supra*, at 935.

plished without delay, Lautenschlaeger encouraged Vest/Victory to obtain bids from private salvors as to the cost of wreck removal. Vest/Victory proceeded to obtain bids from three salvors, one of which was recommended by Lautenschlaeger. By early June the three bidding salvors were Solar Sand and Gravel Company in the amount of $237,000, Charles Cloutier in the amount of $265,000, and Murphy Marine in the amount of $215,000. Each of the bidders, however, proposed certain contingencies such as the cost of liability insurance and river traffic control assistance.[14] With these bids in hand, conditional as they were, Switzerland General on April 8 set up a loss reserve of $150,000.

Murphy Marine, the apparent low bidder wanted assurance that sufficient funds would be available as payment in the event the wrecked barge was successfully removed. Wade advised Lautenschlaeger that he had, on behalf of the primary carrier, $100,000 available toward payment of the wreck removal claim and that the balance of the necessary funds would have to be forthcoming from Switzerland General. It was Wade's understanding that the primary purpose of processing the bids was for Vest/Victory to proceed with removal and not allow the government to come in and take over the removal of the barge. It was Lautenschlaeger's understanding that the primary purpose of securing the bids was not to have Vest/Victory remove the barge, but to be in a position to contest the cost which the government might incur in removing the barge. Lautenschlaeger advised Switzerland General's agent by letters of May 8 and 30 that he strongly recommended abandonment of the barge, but he was clearly under the impression that

Switzerland General was financially involved in contributing toward whatever might be the cost of removal of the wreck.

Matters came to a head on June 5 when Lautenschlaeger wired Stuart "it would be to the best interest of all concerned for the assured to abandon the barge."

Although Switzerland General did not demand or direct that Vest/Victory abandon the barge, Wade construed Switzerland General's position to be that it was Vest/Victory's duty to cooperate with the excess carrier or there would be "a parting of the ways if abandonment did not take place," and that upon abandonment, Switzerland General would make the required contribution to pay the government's expenses in removing the barge. Concerned that Switzerland General was changing its position, Wade, on June 9, telephoned Lautenschlaeger saying: "I want to get this pinned down. Do we have coverage? Do we not have coverage?" Lautenschlaeger told Wade that Switzerland General had available coverage for claims of wreck removal of $234,000 in excess of $100,000 primary P&I coverage. On June 10, Wade confirmed by letter this understanding.[15] When Vest/Victory failed to effectuate removal within the time specified by the government, the Corps notified Vest/Victory of its intention to proceed with removal and contracted with Murphy Marine, the firm which had submitted the low bid to Vest/Victory, as the salvor to remove the wrecked barge, with the ultimate cost being $393,936.28, exclusive of oil pollution expense. It was after the government effectuated removal of the wrecked barge that Switzerland General for the first time denied that its coverage extended to the cost of the wreck removal.

---

14. Wade's estimate that liability insurance for Murphy would be approximately $10,000 was not controverted by Switzerland General.

15. This letter stated:
   Additionally, this confirms our discussions wherein you advised me that it was the position of Switzerland General that with regard to the claims for wreck removal Switzerland's coverage in the amount of $234,000 in excess of $100,000 was available under the protection and indemnity coverage of Barge B-521 to satisfy such claims.
   We find as a fact that Lautenschlaeger at all pertinent times was under the impression that Switzerland General's "layer of coverage" would be invaded by the cost of wreck removal, whatever it may prove to be, and he consistently conveyed this impression to Wade throughout the course of their oral negotiations.

It is upon these facts that Vest/Victory contends that they detrimentally relied upon the representations of Switzerland General's agent/attorney that there was coverage for the cost of removal of the wreck of the barge. Had they known that such coverage did not exist, Vest/Victory maintain they could have contracted with Murphy Marine at an estimated savings of well over $150,000. Switzerland General's position is that while it acknowledged the "availability" of P&I coverage under the policy, such coverage was "applicable" only in accordance with its terms, i.e., only upon a showing of liability on the part of the owner of the sunken vessel.

Although Vest/Victory's position on estoppel has appeal as a matter of equity and one might wish to cast aside as semantics the dichotomy of "available" coverage versus "applicable" coverage, we are constrained to hold that a case of estoppel has not been made out. At most, Vest/Victory has shown that the attorneys, Lautenschlaeger as well as Wade, were mutually mistaken as a matter of law in the interpretation of the P&I coverages as set forth in SP–23. It is evident that both sides knew the true facts regarding the casualty and nothing was withheld from either party relating to an understanding of the P&I coverage vis-a-vis the casualty, and certainly the innocence of Barge B–521 was known from the very beginning.

The general rule recognizes that while a party may be estopped to assert a position "inconsistent with an admission which he has previously made and in reliance upon which the other party has changed his position," this principle "does not apply, however, to an admission as to the law or as to the legal effect of a contract." 28 Am. Jur.2d *Estoppel and Waiver*, § 52 at 663–64. The Mississippi Supreme Court applied this principle in *Mississippi Power & Light Co. v. Pitts*, 181 Miss. 344, 179 So. 363, 365 (1938), stating that estoppel will not be applied "where both parties are equally in possession of all the facts pertaining to the matter relied on as an estoppel, and the position taken thereto involved solely a question of law." Again in a case involving the construction of a mineral lease, the Mississippi Supreme Court refused to apply estoppel, stating:

> Since the representations involved issues of law, estoppel does not apply. We hold that where, as in the case at bar, the parties were equally informed as to the essential facts or where the means of knowledge were equally open to them, the courts will not give effect to estoppel.

*Barnett v. Getty Oil Co.*, 266 So.2d 581, 587 (Miss.1972).

Furthermore, under the federal law of the Fifth Circuit, the doctrines of waiver and estoppel cannot be used to extend the terms of an insurance contract or to provide coverage that is excluded by the policy. Thus, in *Mason Drug Co. v. Harris*, 597 F.2d 886 (5 Cir. 1979), where the construction of a flood insurance contract was at issue, the court found that the flood loss occurring on the same day as the insurance application was completed and the first premium received was not covered since the policy expressly provided "that loss already in progress on date of application is not covered." *Id.* at 887. The insured was precluded from recovering under the policy even though the insurer's agent had told the insured that the policy would be effective as of the morning of the date of the application since "the doctrine of waiver cannot be applied to provide coverage where coverage does not exist under, or is excluded by, the policy contract." *Id.* at 888.

To the same effect is *Reisman v. New Hampshire Fire Ins. Co.*, 312 F.2d 17 (5 Cir. 1963), which involved construction of a marine insurance policy which covered damage from "perils of the sea." In that case, the insurance agent wrote the boatowner and stated that the bottom of the boat was covered with barnacles and should be painted. While at the yard, the boat sank. The vessel was declared a constructive total loss, and attempts to salvage were abandoned. When the vessel was finally raised ten months later, the bottom was found full of worm holes, which caused the sinking. The insurer refused to pay since the cause of the

sinking was not a peril of the sea. The insured relied upon the doctrine of estoppel, concerning which the court stated as follows:

[T]he insured insists that since the insurer, whose agent had observed the foul bottom, requested that she have her boat hauled and painted (which may have disclosed the condition) it is liable for the loss. While this argument is appealing, the insurance company cannot be said to have known of the presence of worms, or teredos as they are called. Oysters and barnacles were visible from ashore, but the worms could only be detected by raising the vessel (which was subsequently done) and observing the bottom. *It is the law of this Circuit that conditions going to coverage or scope of a policy of insurance, as distinguished from those furnishing a ground for forfeiture, may not be waived by implication from conduct or action. C. E. Carnes & Co. v. Employers' Liability Assur. Corp.*, 5 Cir. 1939, 101 F.2d 739. To grant the insured coverage because of this conduct would be to extend the coverage of the policy itself, which is prohibited.

*Id.* at 20 (emphasis added).

In *Reliance Ins. Co. v. The Escapade*, 280 F.2d 482 (5 Cir. 1960), the court found the elements of estoppel precluded the insurer from asserting a breach of the warranty of private pleasure use of a yacht hull policy. In *Reliance*, the insurance agent learned, four days after the yacht's stranding, that the clause prohibiting charter of the yacht absent the insurer's permission had been breached on the day of the stranding. Nonetheless, the agent refused to accept abandonment and declined to take action pursuant to the Sue and Labor Clause, thereby putting the full responsibility of salvage on the insured. Furthermore, the agent made clear to the insured that the insurer would disclaim any further liability if the insured did not arrange for salvage. Subsequently, the insurer informed the insured that it was not accepting liability in connection with the yacht's accident. Recognizing the general rule that the doctrines of waiver and estoppel may not be

utilized to extend coverage, the court stated:

But the estoppel here found as a fact by the District Court does not create a new liability or grant a coverage not already in the policy. As we pointed out this hull policy by traditional language reflecting the even more ancient traditions of marine underwriters intends to, and does, cover expressly damage from perils of the seas. Stranding is a peril of the sea. So is pounding from the angry waves. Liability under the policy will be absent not because the peril is not covered, but because action of the Assured in chartering the Yacht has ostensibly *"forfeited"* the policy coverage otherwise existing.

*Id.* at 487 (emphasis added). Since the private pleasure warranty merely provided a defense to coverage, the court held that "it may be waived or the underwriter may be estopped to assert it, and doing so is not expanding or creating a new coverage." *Id.* Since the insurer had knowledge of the breach of warranty, its demands, taken in detriment of the insured, that the insured undertake such costly actions or run the risk of losing its right to insurance proceeds, which demands were inconsistent with the subsequent denial of coverage, had the effect "of reviving the contract obligation theretofore 'forfeited' for breach of warranty or other policy provision." *Id.* at 490 (footnote omitted). *Reliance* was distinguished in *Reisman, supra*, where the court stated that "the estoppel applied in [*Reliance*] did not create a new liability or grant a coverage not already in the policy." *Reisman, supra*, at 20.

Mississippi state law is to the same effect. Thus, under the law of Mississippi,

waiver or estoppel can have a field of operation only when the subject matter is within the terms of the policy, and they cannot operate radically to change the terms of the policy so as to cover additional subject matter. Waiver or estoppel cannot operate so as to bring within the coverage of the policy property, *or a loss, or a risk*, which by the terms of the

policy is expressly excepted or otherwise excluded. An insurer may be estopped by its conduct or knowledge from insisting on a forfeiture of a policy, but the coverage or *restrictions on the coverage* cannot be extended by the doctrines of waiver or estoppel."

*Employers Fire Ins. Co. v. Speed*, 242 Miss. 341, 133 So.2d 627, 629–30 (1961) (emphasis added). Although an insurance company may be equitably estopped from insisting on a forfeiture of the policy, *Old Equity Life Ins. Co. v. Jones*, 217 So.2d 648 (Miss. 1969) (company estopped to deny its acceptance of insured's application), the doctrines of waiver and estoppel may not be used to reform an insurance contract "to create a liability for a condition . . . excluded by the specific terms of the policy." *Frank Gardner Hardware & Supply Co. v. St. Paul Fire & Marine Ins. Co.*, 245 Miss. 320, 148 So.2d 190, 193 (1963).

In the case sub judice, the parties were on an equal footing, represented by experienced and competent admiralty attorneys who are not in position to rely upon the soundness of the contract interpretation or legal opinion of the potential adversary. Neither the rules of law nor the principles of equity could recognize any such reliance as justified or a detriment for which judicial relief would be warranted.

We accordingly declare that St. Paul and Switzerland General have no liability to Vest and/or Victory to reimburse them for their payment of the government's cost of removal of the wrecked barge.