CONTINENTAL OIL COMPANY

v.

BONANZA CORPORATION and
Republic Insurance Company.

Civ. A. No. H–78–944.

United States District Court,
S. D. Texas,
Houston Division.

Aug. 25, 1980.

Randy McClanahan, Baker & Botts, Houston, Tex., for plaintiff.

Marion E. McDaniel, Jr., Eastham, Watson, Dale & Forney, Harold K. Watson, Vinson & Elkins, Houston, Tex., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CIRE, District Judge.

This is an admiralty and maritime action under Rule 9(h) of the Federal Rules of Civil Procedure and was tried to the Court without a jury. The Plaintiff has filed suit against the owners and insurers of the M/V AQUA SAFARI to recover damages incurred following the sinking of the AQUA SAFARI on January 1, 1977.

After hearing the testimony, reviewing the stipulations and pleadings and weighing all of the evidence, the Court makes the following:

### Findings of Fact

1.

On December 28, 1976, a charter party was entered into between Continental Oil Company ("CONOCO") and the Bonanza Corporation ("Bonanza") to provide the vessel AQUA SAFARI as a standby vessel for offshore oil exploration activities carried on by CONOCO.

2.

Under the charter, Bonanza was required to maintain marine hull and machinery and protection and indemnity insurance coverage. The insurance was to name CONOCO as an additional assured under the policies and waive subrogation rights against CONOCO.

3.

On December 27, 1976, an insurance binder was issued setting forth the existence of the insurance policies and subsequently Insurance Policy No. MI–6494 was issued by Republic Insurance Company ("Republic") insuring the AQUA SAFARI and naming CONOCO as an additional assured and waiving subrogation rights against CONOCO.

4.

Under the charter agreement with CONOCO, Bonanza had the AQUA SAFARI report to High Island Block 110, offshore Texas for work as a standby boat during drilling operations carried on by the Transworld Drilling Rig No. 64 and the Drill Tender ERNIE MILLER.

5.

On the morning of January 1, 1977, at 5:30 a. m., the AQUA SAFARI came to Transworld Rig 64 to pick up a mud log report to be transported to the ERNIE MILLER. Upon arrival at Transworld 64, the vessel was told to stand by for several minutes until the report could be brought down to it. The AQUA SAFARI then set anchor and drifted back on her anchor line, crossing the anchor line of the Transworld 64.

6.

When the AQUA SAFARI was advised to come alongside the drilling rig, she began to pick up her anchor. As the AQUA SAFARI pulled in her anchor rope, her crew lost control of the vessel. The captain and deckhand of the AQUA SAFARI were seen to run to the stern of the vessel and then to the wheelhouse.

**7.**

By the time the captain returned to the wheelhouse, the AQUA SAFARI had drifted underneath the Transworld 64, entangling her prop and radio antenna and bridle lines placed there. The master and deckhand of the AQUA SAFARI then abandoned the AQUA SAFARI and the vessel sank directly beneath the Transworld 64.

**8.**

Soon after the sinking of the AQUA SAFARI, the Transworld 64 completed the well at the location. Because of possible dangers in moving the drilling rig, demand was made by CONOCO on Bonanza to remove the wreck of the AQUA SAFARI. Both Bonanza and Republic refused to proceed with the removal of the AQUA SAFARI.

**9.**

In order to begin production of the completed wells at the site, CONOCO was required to bring in a fixed platform and place it on location. CONOCO contracted with Brown & Root to place the fixed structure on location.

**10.**

The presence of the AQUA SAFARI constituted a continuing hazard to the placement of the fixed structure and CONOCO therefore decided that the Brown & Root derrick barge previously mobilized to place the fixed structure on location would be the most reasonable means of removing the AQUA SAFARI from the location so that the wreck would not cause danger to any other structures or pipelines in the area.

**11.**

The total cost of the various surveying, diving and removal operations incurred by CONOCO in connection with the removal of the AQUA SAFARI totalled $109,000.00.

**12.**

Republic alleged in its answer to the instant action that there had been a change of management of the vessel in violation of the terms of the policy issued by that defendant. Republic further alleged that under said policy, such a change of management would void policy coverage.

**13.**

But the Court finds from the testimony of Mr. Jim Fuller and Gary Freeman, and the documents introduced in conjunction with such testimony that at no time was there any change of management of the AQUA SAFARI. Although negotiations were entered into for the sale of the vessel to Mr. Gary Freeman, Mr. Fuller and Mr. Freeman make clear that the terms and conditions of the sale were never carried out by Mr. Freeman and the contract, whether characterized as a lease-purchase agreement or otherwise, never came into being.

*Conclusions of Law*

**1.**

This suit comes under the admiralty and maritime jurisdiction of the Court. 28 U.S.C. § 1333; *Irwin v. Eagle Star Insurance Company*, 455 F.2d 827 (5th Cir. 1972).

**2.**

Where a vessel strikes a stationary object, there is a presumption of fault on the part of the moving vessel. *A. T. & T. v. Steuart Transportation Company*, 1978 A.M.C. 1680 (D.Md.1977); *Standard Dredging Co. v. The SS SYRA*, 290 F.Supp. 260 (D.Md.1968). The Court finds that Bonanza has failed to overcome this presumption of fault on the part of the AQUA SAFARI in striking first the anchor line of the Transworld 64 and then coming into collision with the underside of the stationary drilling rig.

**3.**

The Court likewise finds that negligence on the part of Bonanza, its master and crew has been established by a preponderance of the evidence and the Court finds that the sole cause of the sinking of the AQUA SAFARI and all damages resulting as a consequence of the sinking were the fault of Bonanza.

**4.**

Argument was made by Republic that under the laws of the State of Texas,

no action could proceed directly against it in this action. But the Court finds that there are a number of possible bases for the institution and continuance of this proceeding, not only against Bonanza but against Republic.

5.

CONOCO may proceed directly against Republic because of the privity of contract between CONOCO and Republic. The insurance policy issued by Republic named CONOCO as an assured, and it is well settled that as an additional assured, CONOCO has the same rights as any other assured under the policy. See generally *R. Keeton, Insurance Law* §§ 4.1(b)(c) and (d) (1971).

6.

Likewise, the Court finds that CONOCO would have standing to proceed directly against Republic because it was a third-party beneficiary to the contract of insurance between Republic and Bonanza. *Cumis Insurance Society, Inc. v. Republic National Bank*, 480 S.W.2d 762 (Tex.Civ.App.—Dallas, 1972). The policy of marine insurance was obtained pursuant to the requirements of the charter party between CONOCO and Bonanza, and it was for this reason that Republic sold the policy to Bonanza.

7.

■ The Court, having found that CONOCO may proceed directly against Republic, as well as Bonanza, holds that under the policy of insurance issued by Republic, there is a basis for a finding of liability against Republic.

8.

The policy contains a provision requiring the payment of wreck removal expenses, as here, when such removal is compulsory by law. Republic points to the decisions of *Seaboard Shipping Corp. v. Jocharanne Tugboat Corp.*, 461 F.2d 500 (2d Cir. 1972) and *Progress Marine, Inc. v. Foremost Insurance Co.*, 1979 A.M.C. 70 (S.D.Tex.1978), as standing for the proposition that removal is "compulsory by law" only where written demand has been made by governmental authority. But such a restrictive interpre-tation of the language is unjustified. *Heep L. Buglass, Marine Insurance and General Average in the U.S.* (1973), "Protection and indemnity underwriters do cover wreck removal expenses but it must be emphasized that, absent any specific agreement to the contrary, underwriters insuring wreck removal expenses are only liable if their assured is legally liable for removing the wreck." *Id.* at 64–65. See, also *E. R. Ivamy Marine Insurance*, (2d Edition 1974).

9.

The Court further finds that under the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331, *et seq.*, and the regulations issued thereunder, the removal of the AQUA SAFARI was compulsory by law. Both 43 C.F.R. § 3307.3–6 and the Lease Agreement required CONOCO to remove all equipment from the leased premises within one year after termination of the lease. And a crewboat has been held to be "equipment" used in oil well exploration. *Continental Casualty Co. v. Associated Pipe & Supply Co.*, 447 F.2d 1041 (5th Cir. 1971). Although the Court recognizes that the equipment removal provisions generally address themselves to removal *not later than* one year following termination of the lease, the earlier removal by CONOCO was prudent in order to mitigate damages and losses and to enable CONOCO to continue drilling and producing the lease. *Tennessee Valley Sand & Gravel Co. v. M/V DELTA*, 598 F.2d 930 (5th Cir. 1979).

10.

Under the provisions of the insurance policy, there is protection from liability for damages or expenses in connection with fixed or movable objects or other property. The evidence reflected that CONOCO, as an additional assured, has reason to believe that it was exposed to potential liability for damage to other property in the area of the sinking. CONOCO could have been liable in its capacity as owner of the vessel. *Wedlock v. Gulf Mississippi Corp.*, 554 F.2d 240 (5th Cir. 1977). Under the terms of the policy, having expended money in connection with "movable objects or other proper-

ty," CONOCO, as an assured under the policy, is entitled to recover its expenses from Republic.

11.

Because the Court finds that CONOCO has already, as an assured, spent money for the removal of the wreck, both under the wreck removal provisions and the damage or expenses in connection with "movable objects or other property" provisions in the policy, the argument by Republic that it need make no payment because the policy is one of indemnity is without merit.

12.

 There is ample evidence that the cost to CONOCO for the removal of the AQUA SAFARI represented the reasonable salvage expenses. The use of the Brown & Root derrick barge already under contract was both prudent and appropriate. Accordingly, because the sinking of the AQUA SAFARI was the sole fault of Bonanza, judgment is rendered herein in favor of CONOCO and against Bonanza in the amount of $109,000.00. Judgment is also rendered in favor of CONOCO and against Republic, as insurer for Bonanza and CONOCO, for the reasons set forth above.

13.

The Court further finds that there are no peculiar circumstances here that would cause it to deviate from the general rule that prejudgment interest is to be allowed as a matter of course. For that reason, there shall be an award of such interest at the rate of 9% from the date of the sinking. *Mobil Oil Corp. v. Tug of Pensacola*, 472 F.2d 1175 (5th Cir. 1973); and *Southern Pacific Transportation Co. v. The Tug CAPTAIN VIC*, 443 F.Supp. 722 (E.D.La.1977).

14.

Finally, the Court finds that there is no evidence to support the plea of limitation of liability raised by Bonanza in its answer. 46 U.S.C. § 183(a). It is well settled that the burden is on Bonanza to establish that it lacked privity or knowledge with respect to the events leading to liability herein. *Tug OCEAN QUEEN, Inc. v. Tanker*

*FOUR LAKES*, 398 F.Supp. 1062 (S.D.N.Y. 1974). There was overwhelming evidence that the Master, Gary Freeman, was the managing agent of Bonanza with respect to affairs relating to the vessel. Indeed, the very charter with CONOCO in this matter had been executed on behalf of Bonanza by Gary Freeman. Gary Freeman was present on the AQUA SAFARI at the time of the casualty herein with full knowledge of the negligence of the vessel, including the failure of the crew, including himself, to maintain a proper lookout for the anchor line of the Transworld 64. Clearly, the negligence of the vessel and her crew was within the privity and knowledge of Bonanza and limitation will be denied. *States Steamship Company v. United States*, 259 F.2d 458 (9th Cir. 1958).