CONTINENTAL OIL COMPANY,
Plaintiff-Appellee,

v.

BONANZA CORPORATION and
Republic Insurance Company,
Defendants-Appellants.

No. 80–2317.

United States Court of Appeals,
Fifth Circuit.

June 1, 1982.

Opinion on Rehearing and Rehearing En Banc Aug. 2, 1982.

Vinson & Elkins, Harold K. Watson, Houston, Tex., for defendants-appellants.

Eastham, Watson, Dale & Forney, Marion E. McDaniel, Jr., Houston, Tex., for Bonanza Corp.

Baker & Botts, Randy McClanahan, Houston, Tex., S. Gene Fendler, Liskow & Lewis, New Orleans, La., for plaintiff-appellee.

Before DYER *, SAM D. JOHNSON and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

This case calls upon us to descend into the depths of the maritime insurance world to determine when the raising of a sunken wreck is "compulsory by law." Continental Oil Company (Conoco) brought suit against Bonanza Corporation (Bonanza) and Republic Insurance Company (Republic) to recover expenses for removing the wreck of the Aqua Safari, an ill-fated 65 or 70 foot vessel that Bonanza had chartered to Conoco. The district court found that Conoco was entitled to recover its expenses from both the vessel owner and the insurance company, and this appeal followed. We agree with the district court that the wreck was the fault of the vessel owner and that Conoco's removal of the wreck was "compulsory by law" under the insurance policy, and we affirm.

I. Facts

The events which brought about the disappearance beneath the ocean waves of the Aqua Safari, chartered by Conoco from its owner, Bonanza, are not in dispute. The Aqua Safari was chartered as a standby boat in Conoco's offshore drilling operations. The boat's primary function was to ferry "mud log" reports between Conoco's offshore rig and other vessels in the vicinity. Bonanza was to provide the captain and crew for the Aqua Safari's courier missions.

The charter party agreement also required Bonanza to procure insurance on the vessel. Conoco was to be named as an additional insured on each policy. In compliance with the charter party agreement, Bonanza purchased a standard form Protection & Indemnity (P&I) policy from Republic providing one million dollars of coverage. The policy, known in the trade as SP–38, affords insurance coverage for, among other things, wreck removal expenses "when such removal is compulsory by law..."[1] The policy also provides that when the assured has any interest in the vessel other than as a shipowner, the insurer's liability shall not be greater than "if the assured were the sole owner and entitled to petition for limitation of liability."[2] The policy named both Bonanza and Conoco as assureds.

On January 1, 1977, the Aqua Safari reported for duty at the drilling rig, the Transworld 64. The Aqua Safari's task that day was to pick up a drilling report and bring it to another vessel which would then radio the report to Conoco's land-based headquarters. The Transworld 64, a massive three-legged moveable drilling rig, presents a myriad of hazards to unwary small craft; the Aqua Safari fell victim to its captain's unwariness. While awaiting the drilling report, the Aqua Safari drifted underneath the Transworld 64 where the vessel's prop and radio antenna became entangled in the drilling rig's mooring lines. Before the vessel could be freed, it began to take water. The pumps were to no avail and the boat sank below the Transworld 64, where it

---

* Circuit Judge of the Eleventh Circuit, sitting by designation.

1. The clause concludes: "provided, however, that there shall be deducted from such claim the value of any salvage recovered from the wreck by the assured."

2. "It is expressly understood and agreed if and when the assured has any interest other than as a shipowner in the vessel named herein, in no event shall this Company be liable hereunder to any greater extent than if the assured were the sole owner and entitled to petition for limitation of liability in accordance with present and future law."

began to settle into the soft mud of the ocean floor.

Initially, Conoco was concerned about the dangers in moving the Transworld 64 with a sunken craft beneath it. Conoco demanded that Bonanza remove the wreck from under the drilling rig, but Bonanza refused. The Transworld 64 was then moved without incident. The Aqua Safari, Conoco believed, still posed a danger, however, to other wells and to oil pipelines in the vicinity. Because of the potential for damage if the Aqua Safari were thrown by seas against a nearby pipeline, and because Conoco wished to place a fixed structure on its newly-drilled well, Conoco decided to remove the wreck. It was determined that the most prudent means of removal was a derrick barge that was already on the scene to assist in the placing of the fixed structure. In March, 1977, the derrick barge successfully raised the Aqua Safari at a cost to Conoco of $109,000. Conoco then sued Bonanza and Republic to recover these costs.[3]

The district court, in a multi-faceted opinion, found both Bonanza and Republic liable on a variety of theories. 511 F.Supp. 62 (S.D.Tex.1980). First, the court found that the Aqua Safari's journey to the depths was solely the fault of its captain and crew, and, therefore, Bonanza was liable for all damages resulting from the wreck. Second, the court found that Republic was liable directly to Conoco on the insurance policy. The court held that two terms of the policy covered wreck removal expenses. The court found the expenses covered, first, by the term of the policy insuring wreck removal expenses when removal is compulsory by law. Second, the court found coverage under the term insuring expenses in connection with movable property. Finally, the court rejected Bonanza's plea to limit its liability. The court reasoned that Bonanza's master was the "managing agent of Bonanza with respect to affairs relating to the vessel." Because the negligence of the master was within the privity or knowledge of Bonanza, limitation was denied.[4] From this judgment, both Republic and Bonanza appeal.

## II. Bonanza's Liability

The district court held Bonanza liable because of the negligence of the Aqua Safari's master in allowing the vessel to drift under the Transworld 64, starting the irreversible process that led to the sinking. Neither Bonanza nor Republic contests the finding of negligence. Having negligently caused the Aqua Safari to sink below the drilling rig, Bonanza is liable for Conoco's costs in removing the vessel. See *Tennessee Valley Sand & Gravel Co. v. M/V Delta*, 598 F.2d 930, 934 (5th Cir. 1979), *modified per curiam on other grounds*, 604 F.2d 13 (5th Cir. 1979). We affirm the district court's judgment holding Bonanza liable.

## III. Direct Action?

Although Bonanza is liable to Conoco for wreck removal expenses, Conoco may not recover directly against Republic as Bonanza's insurer. The contract between Bonanza and Republic is written as an indemnity contract, not as a liability contract. In a liability contract, the insurer agrees to cover *liability* for damages. If the insured is liable, the insurance company must pay the damages. In an indemnity contract, by contrast, the insurer agrees to reimburse expenses to the insured that the insured is liable to pay and has paid. An indemnity policy covers only the insured's actual expenses.

We have held that the insured on an indemnity contract may not bring an action against the insurance company until the insured has actually paid money on his liability. *Stuyvesant Insurance Company v.*

---

3. Conoco also brought an in rem action against the Aqua Safari after raising the wreck and took judgment by default in the amount of $96,704.38. *Continental Oil Company v. The M/V Aqua Safari*, No. 78–1464 (E.D.La. August 10, 1978).

4. 46 U.S.C. § 183(a) permits a shipowner to limit its liability to the value of the vessel unless the vessel's negligence is within the privity or knowledge of the owner.

*Nardelli*, 286 F.2d 600 (5th Cir. 1961). If the insured cannot enforce his own indemnity policy until having paid out money, it follows that the insurance company has no greater obligation to the person to whom the insured is liable. *See Ahmed v. American S.S. Mutual Protection & Indemnity Ass'n*, 640 F.2d 993 (9th Cir. 1981) (New York law); *cf. Liman v. American Steamship Owners*, 299 F.Supp. 106 (S.D.N.Y.) *aff'd*, 417 F.2d 627 (2d Cir. 1969) *cert. denied*, 397 U.S. 936, 90 S.Ct. 946, 25 L.Ed.2d 116 (1970) (the court allowed an action by an insolvent insured against the insurance company under an indemnity policy when the insured had contracted to satisfy a judgment although the insured had not actually performed the contract).

 Conoco has also failed to bring our attention to any principle of law, federal or state, that overrides the indemnity provision and authorizes a direct action against the insurer. *Cf. Olympic Towing Corp. v. Nebel Towing Co.*, 419 F.2d 230, 237 (5th Cir. 1969) (Louisiana direct action statute overrides indemnity restriction in a maritime protection and indemnity policy), *cert. denied*, 397 U.S. 989, 90 S.Ct. 1120, 25 L.Ed.2d 396 (1970). Federal admiralty law provides no general right to sue an insurance company directly, *Stuyvesant, supra*, and, looking landwards, Texas law refuses to permit a direct action against an insurance company. Tex.R.Civ.P. 51(b); *Russell v. Hartford Casualty Insurance Co.*, 548 S.W.2d 737 (Tex.Civ.App.1977—*writ ref'd n. r. e.*).

### IV. Was the removal of the Aqua Safari "compulsory by law"?

While Conoco may not bring a direct action against Republic based on Bonanza's status as an assured, Conoco itself is also an assured under the policy and has paid wreck removal expenses. Thus, Conoco may assert rights against Republic in this action based on Conoco's independent status as an assured under the policy.

The Protection and Indemnity policy issued by Republic provides that Republic will indemnify an assured as owner of the Aqua Safari for "costs and expenses of, or incidental to, the removal of a wreck of the vessel named herein when such removal is compulsory by law." Republic argues that the removal of the Aqua Safari was not compulsory by law.[5] Rather, according to Republic, Conoco was under no legal obligation to raise the Aqua Safari and did so solely in aid of its operations in managing the well. Conoco protests that it faced potential liability should the wreck of the Aqua Safari have been tossed by a storm upon a neighboring pipeline. Moreover, Conoco insists it was required by federal regulations to remove all equipment from its leasehold. Without the guidance of Fifth Circuit authority at that time, the district court held that Conoco's removal of the Aqua Safari was compulsory by law.

Many would sooner walk the plank than engage in the risky business of interpreting maritime insurance policies. Unlike the district court had, however, we have the benefit of progress in construing the language "compulsory by law." *See Progress Marine, Inc. v. Foremost Insurance Company*, 642 F.2d 816 (5th Cir. 1981), *cert. denied*, 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1981). In *Progress Marine*, a barge sank through the owner's negligence. The barge owner raised the wreck and sought indemnity under the wreck removal provision of its standard SP–38 P&I insurance policy. The district court held that the removal, though prudent, was not compulsory by law. We vacated the district court's judgment, holding that the district court had applied an improper legal standard.

*Progress Marine* rejected the notion that the words "compulsory by law" constitute a term of art in the marine insurance industry. 642 F.2d at 819. Rather than view "compulsory by law" as encrusted by the barnacles of jargon, we held that the words

---

**5.** Republic also argues that the compulsion, if it existed, fell on Conoco in some other capacity than "as owner" of the Aqua Safari. We ad- dress that argument later in this opinion in part V.

must be given their plain and natural meaning. We then rejected the insurance company's suggested interpretation of "compulsory by law." The insurance company argued that "compulsory by law" requires that a government agency has ordered a vessel owner to remove a wreck. We held this reading too narrow. We also refused, however, to accept the vessel owner's argument that *any* legal obligation arising out of a wreck satisfies the compulsory by law requirement.[6]

Steering between these two extremes we formulated a new standard for a removal "compulsory by law."

> [R]emoval occasioned by an unarticulated or unreasonable apprehension of criminal or civil liability could not be considered "compelled by law." On the other hand, where removal was reasonably required by law, or where failure to remove would have reasonably exposed an insured to liability imposed by law sufficiently great to justify the expense of removal, then, we believe, that such removal could be considered "compelled by law" for purposes of recovery. However, an additional inquiry must be made as to whether the removal was in fact "compelled by law," that is, whether removal was performed as the result of a subjective belief on the part of the insured that such was reasonably necessary to avoid legal consequences of the type contemplated by this policy.

642 F.2d at 820 (footnote omitted).

█ The *Progress Marine* court declined to rest its holding on a choice between state and federal law on this issue, finding no difference between federal marine insurance principles and those of the proffered state. The choice of law issue arises because of *Wilburn Boat Co. v. Firemans*

*Fund Insurance Co.,* 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955). *Wilburn Boat* holds that in the absence of a federal statutory or judicial admiralty rule of law, or the need for one, state law governs the construction of marine insurance contracts.[7] Because the rule announced in *Progress Marine* appears to be amphibious, not confined solely to land or to water, and because no party here has suggested that Texas law has a unique vantage point on marine insurance, we, like the *Progress Marine* court, need not step aboard the *Wilburn Boat.*

*Progress Marine* sets out an objective and a subjective test. Applying the *Progress Marine* test to the facts that the record reveals in this case, we believe that the removal was compulsory by law.

### A. The Objective Test

█ *Progress Marine* charts two routes to the destination that a removal is objectively required by law. The first is when a removal is "reasonably required by law." 642 F.2d at 820. The second is when "failure to remove would have reasonably exposed an insured to liability imposed by law sufficiently great to justify the expense of removal...." *Id.*

Conoco argues that both kinds of legal compulsion existed in this case. Conoco maintains that the removal of the Aqua Safari was reasonably required by "law" since federal regulations required Conoco to remove all its equipment from the seabed within one year after Conoco's lease terminated. Conoco also argues that its failure to remove the Aqua Safari could have exposed it to liability sufficiently great to warrant removal of the wreck. We agree that the potential liability to third parties constituted the compulsion by law in this

---

**6.** We noted that "compulsory by law" connotes something more than simple exposure to legal liability. 642 F.2d at 820 n.7.

**7.** While we have avoided the *Wilburn Boat* inquiry when possible, *see, e.g., Morrison Grain Co. v. Utica Mutual Insurance Co.,* 632 F.2d 424, 429 (5th Cir. 1980), a genuine conflict of laws would require us to undertake it. When admiralty law speaks to a question, state law

cannot override it, *see D. J. McDuffie, Inc. v. Old Reliable Fire Insurance Co.,* 608 F.2d 145, 147 n.1 (5th Cir. 1979), *cert. denied,* 449 U.S. 830, 101 S.Ct. 97, 66 L.Ed.2d 35 (1980). But when admiralty law is silent, and there is no need for uniformity, state law must be heard, *see American Eastern Development Corp. v. Everglades Marina, Inc.,* 608 F.2d 123, 125 (5th Cir. 1979).

case, and, motivated Conoco, at least in part, to raise the Aqua Safari. Thus, we need not address the question of whether federal regulations also compelled removal.

The Aqua Safari, after its fatal entanglement with the Transworld 64, lay approximately forty feet below the surface and was partially covered by mud. Two major pipelines were in the immediate area. The wreck occurred in the heart of the storm season in the Gulf of Mexico. Conoco argues that if a storm were to dislodge the wrecked vessel and drag it across the sea floor into a pipeline, causing an oil spill, Conoco as charterer and as lessor might be liable for the immense resulting damages.

Republic denies that Conoco had any potential liability to third parties for damages that the Aqua Safari might have caused. Republic argues that because Conoco had merely time-chartered the vessel and played no role in the vessel's sinking, Conoco could not be held liable to third parties who might be damaged by the wreck. Conoco replies that even though its liability is not certain, the law does not clearly exonerate a non-negligent time charterer of a wrecked vessel who allows the hazardous wreck to languish on a seabed leased for oil exploration.

There is no settled principle of law that would fix liability on Conoco if the Aqua Safari, propelled by roiled storm waters from its resting place on Conoco's lease, had severed a pipeline. It is true that Conoco's absence of negligence in the sinking of the Aqua Safari might militate against imposing liability on Conoco for any damages the wreck caused. We stated in *Tennessee Valley Sand and Gravel Co. v. M/V Delta*, 598 F.2d 930, 934 (5th Cir. 1979), *modified per curiam on other grounds*, 604 F.2d 13 (5th Cir. 1979) that "[i]f the non-negligent owner exercises his right to abandon [a wreck], he is liable neither for the cost of removal nor for the damages suffered by third parties as a re-

sult of the wreck." Conoco enjoyed a lesser connection to the vessel than that of owner: Conoco was a time charterer. When the owner remains in control of the vessel, the time-charterer is not ordinarily liable for damages due to the owner's fault. *Agrico-Chemical Co. v. M/V Ben W. Martin*, 664 F.2d 85, 91 (5th Cir. 1981). It is also uncertain whether Conoco could be held vicariously liable for Bonanza's negligence. In the personal injury context, at least, a time charterer generally has no liability for injuries caused by the owner's negligence. *See Mallard v. Aluminum Co.*, 634 F.2d 236, 242 n.5 (5th Cir. 1981), *cert. denied*, 454 U.S. 816, 102 S.Ct. 93, 70 L.Ed.2d 85 (1981).

But these principles do not provide an unequivocal answer to the question of Conoco's liability. Specifically, they do not answer whether a non-negligent time charterer can be held liable to third parties for failing to remove a wreck when the wreck was caused by the owner's negligence, the owner is unwilling to remove the wreck, and the wreck lies on the seabed leased by the charterer.

Several facts support Conoco's theory that it faced potential liability. Conoco contracted with Bonanza to employ the Aqua Safari's services in Conoco's oil exploration enterprise. The Aqua Safari under Conoco's orders entered the area of Conoco's operations—an area crisscrossed with pipelines and studded with free-standing wells. When Bonanza disclaimed responsibility for the Aqua Safari's carcass and sought to abandon it, Conoco was left with a derelict vessel that was time chartered to it and lying on its lease. The vessel posed at least some threat to all structures in the vicinity. In the light of expanding concepts of enterprise and vicarious liability, Conoco faced a significant prospect of being held liable for damages should the Aqua Safari become a floating menace.[8]

---

**8.** Even though Bonanza was an independent contractor, Conoco is not necessarily immune from liability. One need go no farther than *Prosser's Law of Torts* at 468 (4th Edition 1971) (emphasis added) to learn that an employer's vicarious liability for the negligence of an independent contractor is a real possibility. [I]t has been contended that the enterprise is still the employers', since he remains the person primarily to be benefited by it; that he selects the contractor, and is free to insist

There would be sound policy reasons to hold Conoco liable if it had ignored the hazard posed by the Aqua Safari once Conoco knew the owner had abandoned the vessel. Conoco chose Bonanza's services and had ample opportunity to determine whether Bonanza was reliable. After Bonanza refused to remove the wreck, only Conoco was in a position to prevent a potential disaster. Conoco's failure to remove the vessel under these circumstances might have been negligent, independent of Conoco's freedom from negligence in the sinking of the vessel.

We can learn much by comparing the facts in this case with the facts of *Progress Marine.* There, a ship went to the bottom because of the negligence of the owners. The wreck lay 300 feet from a high pressure pipeline, 1500 feet from an oil production platform, and near to numerous other offshore oil structures. Hurricane season was drawing near, and, as in this case, the sunken vessel caused concern. "[P]otential exposure to PMI resulting from its wreck rupturing an oil pipeline or breaking the hull of an oil carrying vessel could have been enormous." 642 F.2d at 820.[9] In *Progress Marine*, we did not decide whether the potential liability amounted to the compulsion of law, leaving the inquiry in the first instance to the district court.

■ On the record in this case, however, we can reach a conclusion on this issue. *Progress Marine* requires that "failure to remove would have *reasonably* exposed an insured to liability *sufficiently great to justify the expense of removal.*" 642 F.2d at 820 (emphasis added). Under *Progress Marine*, we must look at three factors. First, we must evaluate the likelihood that the wreck will cause damage, and the likelihood that the assured will be held liable for the damage. Second, we must consider the magnitude of the potential damage. Third, we must balance the potential liability against the cost of preventive medicine: raising the wreck. To justify removing the wreck, the greater the potential damages, plainly the less certainty is needed of the occurrence of damage with resulting liability to the assured.

■ Balancing the three factors, we conclude that Conoco was compelled to remove the wreck. First, the likelihood that a storm would drive the Aqua Safari onto a nearby pipeline is difficult to estimate, but it is virtually certain that storms will sweep the Gulf. Conoco could not count on the Aqua Safari to remain in the mud. The likelihood that Conoco would be held liable was quite real. Liability was not certain, but it was a significant possibility. Second, the potential damages were incalculable. If the Aqua Safari collided with an oil pipeline, not only costly physical damage to the pipeline, but oil pollution was sure to result. As we noted in *Progress Marine*, these damages can be immense. *See also Signal Oil & Gas Co. v. Barge W–701*, 654 F.2d 1164 (5th Cir. 1981), *cert. denied*, —— U.S. ——, ——, 102 S.Ct. 1440, 1441, 71 L.Ed.2d 656 (1982), (pipeline damage of $1,116,234.62). Finally, in relation to the potential damages, the cost of removal was reasonable. The derrick barge that performed the task was already stationed near the wreck.

In these circumstances, we do not believe that Conoco could realistically have stood idly by and awaited an oil pipeline to burst with the cool certainty that Bonanza, not it, would pay. If the Aqua Safari were safely

upon one who is financially responsible, and to demand indemnity from him, and that the insurance necessary to distribute the risk is properly a cost of his business. Upon this basis, *the prediction has been made that ultimately the "general rule" will be that the employer is liable for the negligence of an independent contractor*, and that he will be excused only in a limited group of cases where he is not in a position to select a responsible contractor, or the risk of any harm to others from the enterprise is obviously slight. The English courts have taken steps in this direction, until the position of the ordinary independent contractor in England approaches that of a servant. The American courts have not gone so far, and have continued to repeat the "general rule" of non-liability with exceptions, whose very number is sufficient to cast doubt on the validity of the rule.

9. We noted that federal law might make the owner liable to the United States for discharge of oil or to third parties for pollution damage. 642 F.2d at 821.

at rest in the center of the Atlantic, removal of it would have been an act of voluntarism. Given the huge possible damages, however, Conoco could not undertake the risk of liability. The Aqua Safari was a potential shoal threatening Conoco's oceanic business activities. For purposes of P&I coverage, Conoco's removal of the wreck was reasonably compelled by law.

### B. *The Subjective Test*

■ The second inquiry mandated by *Progress Marine* is whether the removal was actually motivated by the belief that it was necessary to avoid legal liability. 642 F.2d at 820. Lacking the benefit of the *Progress Marine* opinion, the district court did not make specific findings on this point. Ordinarily in these circumstances, we would remand to the district court. A remand in this case would steer a faulty course, however, because the record is fully developed, and it clearly establishes Conoco's motives in raising the Aqua Safari. *See Avery v. Homewood City Board of Education*, 674 F.2d 337, 341 n.5 (5th Cir. 1982). We print critical portions of the record in the note to support the conclusion that Conoco's motives were established.[10]

■ The record shows that Conoco had two motives in seeking to remove the

10. An attorney for Conoco testified on Conoco's concerns in removing the wreck as follows:

Q Why is it that Conoco felt it necessary to demand that this wreck be removed?
A Well, at the time of the sinking of the vessel the well had been completed, it seemed to me, and they were in the process of completing the well, setting casing. And so we knew that it would be only several days before the rig would have to move. And the Transworld representatives felt that they could not remove the rig with that derrick in position as it was.
Q And in fact was the Transworld 64 moved without the AQUA SAFARI being salvaged?
A That's true. Later it was.
Q Were there any other concerns that Conoco had with respect to leaving the AQUA SAFARI on the location?
A Well, it—our first concern was, as I mentioned, that the rig would not move like that. Ultimately they did—they did get it away, but a little bit more risk than they would have liked to have had ordinarily. Our next concern was the fact that even though the rig had left, that the vessel was still within 40 feet of the two wells, the free-standing wells, and because it was in that position we were concerned that a storm or any heavy weather may cause the vessel to move and strike the wells.
Q Did the proximity of the AQUA SAFARI to any pipelines cause you any concern?
A Well, that's true. There was also, in addition to the two free-standing wells, there was a satellite well in proximity and there were two major pipelines in the immediate area.
Q And why was Conoco concerned about those?
A Well, if the vessel were to drag across a line, there was a possibility they could break the line.

Republic conducted the following cross-examination of Conoco's witness:

Q ... You testified, I believe, that you had some concern that the wreck of the AQUA SAFARI might move in a storm and strike the wells, the Conoco wells, I gather that we are discussing, is that correct?
A Yes.
Q Wells that were drilled and owned by Conoco—
A Right.
Q —as lessee, or might strike other pipelines and these are pipelines owned by third parties, is that correct?
A That's correct.
Q Mr. Stitch, did you have any concern that Conoco might be held liable if this happened?
A Yes.
Q On what basis, sir?
A Well, Conoco was the charter of the vessel and we just—I felt that we would just not be entirely exonerated in the event the vessel was abandoned.
Q Did you have any thought that Conoco may have been negligent in the sinking of the AQUA SAFARI?
A Well, I was concerned that certainly that could be contended.
Q Did you know of any facts which might indicate that Conoco was negligent?
A No.
Q Do you know of any basis outside of negligence on which Conoco might have been held liable in such an event?
A Now, are we talking about liability toward Conoco's property or third parties?
Q We are talking about Conoco being held liable to third parties.
A Well, I think it could be—I am not in admiralty law, but I think it could be contended in the event that we were the one that contracted to have it out there, we had some lingering duty. I don't know. But it could—it certainly could be contended that

wrecked vessel. First, Conoco believed that the Aqua Safari might prevent Conoco from installing a fixed well where the drilling rig had conducted its work. Second, Conoco expressed worry that the Aqua Safari might be cast by a storm against nearby freestanding wells, owned by Conoco, or against pipelines owned by third parties somewhat farther away.[11]

Only the second motive satisfies the *Progress Marine* test. Conoco's mixed motives for raising the Aqua Safari, however, do not prevent it from recovering. The subjective test was passed if one of the motives was to avoid a liability found to be the compulsion of law and that motive was sufficient by itself to have prompted the removal. We conclude on the record that Conoco's fear of legal liability was sufficient to stimulate it to raise the wreck. Thus, under *Progress Marine*, the removal was compulsory by law.

V. Was Conoco compelled by law in its capacity "as owner" of the vessel?

 The P&I policy names Conoco as assured but does not cover all expenses Conoco might incur. Rather, it covers Conoco's expenses only "as owner" of the vessel. Republic argues that even if Conoco was compelled by law to remove the Aqua Safari, it was not compelled as an owner (or charterer) of the vessel. Instead, the compulsion fell on Conoco as a mineral lessee. Thus, Republic insists, the wreck removal expenses do not trigger insurance coverage. We do not accept Republic's reasoning.

Republic correctly states the import of our cases on the scope of coverage that a P&I policy gives to a named assured. *See St. Paul Fire & Marine Insurance Co. v.*

*Vest Transportation Co.*, 666 F.2d 932, 945 (5th Cir. 1982) (per curiam affirmance on the basis of the district court's opinion); *Wedlock v. Gulf Mississippi Marine Corp.*, 554 F.2d 240 (5th Cir. 1977); *Lanasse v. Travelers Insurance Co.*, 450 F.2d 580 (5th Cir. 1971) *cert. denied*, 406 U.S. 921, 92 S.Ct. 1779, 32 L.Ed.2d 120 (1972). Under these cases, Conoco may recover under the wreck removal clause only if the compulsion of law arises out of Conoco's ownership of, or interest in, the covered vessel.[12] In *Lanasse, Wedlock*, and *Vest Transportation*, we held that the assured parties could not recover because their liabilities did not arise out of their ownership of, or interest in, the covered vessel. We hold here, however, that the compulsion of law on Conoco flowed from Conoco's interest in the Aqua Safari and, therefore, *Lanasse* and its progeny do not apply.

We hold earlier in this opinion that Conoco's threatened liability if the Aqua Safari severed a pipeline spurred Conoco to remove the wreck with the compulsion of law. This theory of Conoco's liability rested on three crucial facts. First, Conoco was responsible for the Aqua Safari's presence in the midst of the offshore oil fields. Second, the Aqua Safari had come to rest on Conoco's lease. Third, Conoco knew that Bonanza had no intention of raising the Aqua Safari. We noted that Conoco's prospects of liability were such that Conoco was reasonably required to raise the wreck. It is apparent from our reasoning that Conoco was compelled by law not solely because the Aqua Safari lay on Conoco's offshore lease. Rather, Conoco's relation to the vessel as charterer plays a critical role in our conclusion that Conoco faced potential liability. Thus, we believe that Conoco was compelled

---

perhaps we did and if the vessel were to move over and strike the line I am sure Conoco would be sued on it. Whether or not any ultimate liability would be there, I can't answer.

Q But you do know of no facts which would indicate that Conoco was in any way negligent, is that correct?

A In the sinking of the vessel?

Q Yes?

A That's correct.

11. Conoco was initially concerned that the Aqua Safari might interfere with removing the drilling rig from its site. The wreck was not removed before the drilling rig was sent on its way, however, and this concern was not a factor in the actual removal of the Aqua Safari.

12. That Conoco is an assured charterer rather than an assured owner is not sufficient to deprive it of coverage. *See Wedlock v. Gulf Mississippi Marine Corp.*, 554 F.2d at 244.

by law to raise the wreck in the capacity "as owner" of the Aqua Safari.

IV. Limitation of Liability

Both Bonanza and Republic assert that the district court erred in denying limitation of liability. The district court reasoned that Bonanza had the burden to establish that the negligence of the master of the Aqua Safari was not within Bonanza's privy or knowledge. The court found that the Aqua Safari's master, Gary Freeman, was the managing agent of Bonanza for the Aqua Safari. The court concluded that Freeman's knowledge of his own negligence put Bonanza in privity or knowledge of the negligence that sank the Aqua Safari. Bonanza's privity or knowledge under the statute destroyed its entitlement to limitation, and, indirectly, Republic's as well.[13]

■ Republic attacks the district court's conclusion that Freeman was more than a master of the vessel. In Republic's view, Freeman was only the captain of the vessel, and his navigational errors were not attributable to the vessel owner. Under settled law, an owner of a vessel may limit its liability to the value of the vessel when the negligent navigational errors of the master and crew, outside the owner's privity or knowledge, cause the demise of the vessel.[14] *Mac Towing, Inc. v. American Commercial Lines*, 670 F.2d 543, 547–48 (5th Cir. 1982), *Farrell Lines, Inc. v. Jones*, 530 F.2d 7 (5th Cir. 1976). Republic maintains that such is the case here.

The Limitation Act is an ancient vessel plying the seas. We have previously described this 1851 act as "hopelessly anachronistic." *University of Texas Medical Branch v. United States*, 557 F.2d 438, 441 (5th Cir. 1977) *cert. denied*, 439 U.S. 820, 99 S.Ct. 84, 58 L.Ed.2d 111 (1978). The Limitation Act immunizes a shipowner for liability beyond his interest in a vessel unless he has privity or knowledge of the negligence that caused the damage. The purpose of the privity or knowledge rule is to protect "the physically remote owner who, after the ship breaks ground, has no effective control over his waterborne servants." *Tittle v. Aldacosta*, 544 F.2d 752, 756 (5th Cir. 1977).

Originally modeled on English law, the Limitation Act sought to put the American shipowner in parity with his British counterpart. *University of Texas Medical Branch v. United States*, 557 F.2d at 454. The Limitation Act was passed, however, before the rise and triumph of the corporate form of business and the universal use of insurance mechanisms such as P&I policies. G. Gilmore & C. Black, *The Law of Admiralty*, 822 (2d ed. 1974). These developments have undermined the policy of the Limitation Act and created difficult problems of interpretation. *See Maryland Casualty Co. v. Cushing*, 347 U.S. 409, 437, 74 S.Ct. 608, 622, 98 L.Ed. 806 (1954). A particularly intractable problem is the one we confront today: when does a corporation, a

---

**13.** The Limitation Act is codified at 46 U.S.C. § 181 *et seq.* Section 183(a) provides:

The liability of the owner of any vessel . . . for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners shall not . . . exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.

As an insurance company, Republic is not entitled to assert limitation in its own right, *see Olympic Towing Corp. v. Nebel Towing Co.*, 419 F.2d 230 (5th Cir. 1969), *cert. denied*, 397 U.S. 989, 90 S.Ct. 1120, 25 L.Ed.2d 396 (1970). The P&I policy, however, gives Republic the right to limit its indemnity obligation to Conoco's liability if Conoco were entitled to petition for limitation. See Note 2, *supra.* Conoco, of

course, as time charterer, has no right under federal law to limit its liability. *In re Caldas*, 350 F.Supp. 566 (E.D.Pa.1972) *aff'd without opinion*, 485 F.2d 678 (3d Cir. 1973); G. Gilmore & C. Black, *The Law of Admiralty*, 840 (2d ed. 1975).

**14.** Conoco does not argue that Bonanza breached its duty to keep abreast of facts necessary to guarantee the vessel's seaworthiness. *Cf. Complaint of Bankers Trust Co.*, 651 F.2d 160, 171 (3d Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 1436, 71 L.Ed.2d 653 (1982). Nor is there an allegation that the Aqua Safari was unseaworthy because Freeman was an incompetent master. The sole issue is whether Bonanza endowed Gary Freeman with such managerial responsibility that he became more than the master of the Aqua Safari.

legal entity, acquire "privity or knowledge" of the negligent acts of its employees?

 The Supreme Court has noted this difficulty. "A corporation necessarily acts through human beings. The privity of some of those persons must be the privity of the corporation else it could always limit its liability." *Coryell v. Phipps*, 317 U.S. 406, 410, 63 S.Ct. 291, 293, 87 L.Ed. 363 (1943). The crucial issue is how high on the corporate ladder must one climb before charging the corporation with privity or knowledge. In *Coryell*, the court observed that the test is whether "the negligence is that of an executive officer, manager or superintendent whose scope of authority includes supervision over the phase of the business out of which the loss or injury occurred." 317 U.S. at 410, 63 S.Ct. at 293; *Craig v. Continental Insurance Co.*, 141 U.S. 638, 646, 12 S.Ct. 97, 99, 35 L.Ed. 886 (1891); *Coleman v. Jahncke Service, Inc.*, 341 F.2d 956, 958 (5th Cir. 1965), *cert. dismissed*, 382 U.S. 967, 86 S.Ct. 525, 15 L.Ed.2d 463 (1966) and *cert. denied*, 382 U.S. 974, 86 S.Ct. 538, 15 L.Ed.2d 465 (1966). Once the negligence of the vessel is established, the burden of proving a lack of privity or knowledge falls squarely on the vessel owner. *Coryell v. Phipps*, 317 U.S. at 409, 63 S.Ct. at 292; *Coleman v. Jahncke Service, Inc.*, 341 F.2d at 958.

There is no simple test to determine when a manager of a corporation binds the corporation with his privity or knowledge. The leading case is *The Linseed King, Spencer Kellogg & Sons v. Hicks*, 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903 (1932). In *The Linseed King*, a corporation ran a small ferry to transport New Jersey employees across the Hudson to its New York plant. The factory manager, Stover, had been instructed to halt river crossings when the river began to freeze. One winter day, the Linseed King struck an ice floe and sank, drowning many employees. The corporation sought to limit its liability to the value of the Linseed King.

The Court held that Stover's knowledge of the crossing and his failure to prevent it barred the corporation from invoking limitation. The Court emphasized that Stover not only had the duty and authority to prevent river crossings in icy conditions, but also had the power to exercise this authority because the Linseed King was never far from his effective control. The Court concluded that ". . . Stover's position as works manager of the Edgewater plant and the scope of his authority render his privity or knowledge that of the company." 285 U.S. at 511, 52 S.Ct. at 452.

Later cases have also emphasized an officer's scope of authority with respect to the vessel's operations in determining a corporation's privity or knowledge. For example, in *The Marguerite, Lakehead Transportation Co. v. Kewaunee G. B. & W. R. Co.*, 140 F.2d 491 (7th Cir. 1944), a corporate manager, titled the shore captain, contributed to a collision by negligently allowing only one tugboat to tow a barge, and by allowing the single tugboat on the job to use an overly-long tow line. The court found that the shore captain's negligence, which, of course, was within his own privity or knowledge, bound the corporation. The court noted that the shore captain was the corporation's on-site representative, in charge of the vessel's business. He also had responsibility for maintaining the vessel, making recommendations on hiring (subject to the approval of the corporation), and settling claims against the vessel. These responsibilities led the court to hold that the shore captain's privity or knowledge was that of the corporation. *See also United States v. Standard Oil Co.*, 495 F.2d 911 (9th Cir. 1974) (applying the same concept of managerial responsibility in denying the United States' petition to limit its liability).

 If a corporate officer whose privity and knowledge binds the corporation boards the corporation's vessel and takes charge of navigation, his negligence, which is within his own privity or knowledge, becomes the privity or knowledge of the corporation as well. *See Tittle v. Aldacosta, supra.* In *Tittle*, the owner of a boat was on board and in command, though below deck, when a disembarking passenger slipped and injured herself. The accident occurred be-

cause a crew member had breached the owner's instruction to lay a towel on deck when the deck was wet. We denied limitation, holding that the owner had privity or knowledge of the negligence leading to the injury. Similar principles apply when a corporate officer, whose privity or knowledge *is* the corporation's, assumes command of the vessel.

We now turn to the evidence that undergirds the district court's factual conclusion that Gary Freeman was Bonanza's managing agent for the vessel the Aqua Safari. The findings of fact in an admiralty case, like other civil cases, may not be overturned unless clearly erroneous. Fed. R.Civ.P. 52(a); *McAllister v. United States,* 348 U.S. 19, 20, 75 S.Ct. 6, 7–8, 99 L.Ed. 20 (1954); *Candies Towing Co. v. M/V B&C Eserman,* 673 F.2d 91, 93 (5th Cir. 1982).

Bonanza principally engages in the business of land development; it acquired the Aqua Safari in 1973 for business entertainment. Apparently Bonanza found the lure of having its own navy was strong. The vessel was eventually chartered for scuba diving and its use gradually expanded to any charter that would raise revenue. The chartering of the Aqua Safari thus became a separate wing of Bonanza's business, unrelated to the main enterprise of developing land.

Bonanza hired Gary Freeman in 1976 to take over the vessel's operations. Freeman was not only made captain of the vessel and put in charge of maintaining it, but also was the only Bonanza employee who attended the Aqua Safari's business. Freeman did apprise Bonanza of the charters he entered into, and presented them to Bonanza's president for formal approval, but in practice Freeman had free rein to sign charters on Bonanza's behalf. Freeman in fact had entered into the charter with Conoco that proved to be the Aqua Safari's last. Significantly, Freeman took his pay out of profits the Aqua Safari made from the charters; Bonanza paid him no salary. Bonanza thus not only turned over the business of running the Aqua Safari to Freeman but also transferred to him the risk of the venture. In light of this evidence, we cannot say that the district court's finding that Freeman was managing agent of the corporation with respect to the Aqua Safari is clearly erroneous.

Because Freeman was a corporate officer whose privity or knowledge is charged to the corporation, the district court properly denied Bonanza's petition to limit its liability. *The Linseed King, supra.* Republic, which asserts a contractual right to limit its indemnity obligation, fares no better. The insurance policy requires us to consider whether Conoco could have limited its liability assuming it was the sole owner of the Aqua Safari. In making this inquiry, we change only one fact in the case: instead of Bonanza owning the Aqua Safari, we treat Conoco as the owner. Gary Freeman's complete responsibility for the vessel and knowledge of his own negligence remain. Freeman's responsibility for the sinking has the same effect on Conoco's privity or knowledge as it has on Bonanza's: Conoco could not limit. Thus, the district court properly denied Republic's contractual plea for limitation.

### Conclusion

Our voyage ends, and our ship reaches port. We hold that Conoco may recover wreck removal expenses both from Bonanza and from Republic. Bonanza is liable because of the fault of the vessel's master in causing the vessel to sink. Republic is liable because Conoco was insured for the removal of a wreck compulsory by law. We find that the compulsion of law rested on Conoco to remove the wreck, and did so in Conoco's capacity as owner (or charterer) of the vessel. Finally, Bonanza is not entitled to limit its liability since the corporation's managing officer in charge of the vessel had privity or knowledge of the negligence that sank the vessel. For the same reason, Republic cannot assert its contractual right to limit the indemnity it owes to Conoco. The judgment of the district court is

AFFIRMED.

DYER, Circuit Judge, dissenting:

I respectfully dissent because the majority in striving to find coverage in a standard marine insurance policy where there is none has overturned the settled law of this and other circuits.

The facts are simple and undisputed. Bonanza, as owner, and Conoco, as charterer entered into a charter party which provided that the "[o]peration, navigation and management of the vessel [M/V Aqua Safari] shall be under the exclusive control and command of owner and its servants and its master and crew . . . . It is expressly understood and agreed that owner is an independent contractor and neither its employees nor the master and crew of the vessel are servants, agents or employees of the charterer." Further that "[o]wner shall, at its expense man, operate, maintain and repair the vessel."

In accordance with its obligation under the charter party Bonanza obtained a standard SP–38 form of marine policy from Republic which provided that the company would pay " . . . such sums as the assured, as owner of the S/D Stand-By Vessel 'Aqua Safari' shall have become legally liable to pay and shall have paid on account of: loss of, or damage to, or expense in connection with any fixed or moveable object or property of whatever nature; costs or expenses of, or incidental to, the removal of the wreck of the vessel named herein when such removal is compulsory by law . . . ." Conoco was named as an additional assured under the policy.

The sole cause of the sinking of the Safari was the negligence of the Master in the navigation of the vessel. The ocean bottom where the Safari went down was soft and it rapidly sunk into the mud. When viewed by the divers before removal it was half covered with mud and soon would have been completely covered. The wreck was approximately 2000 feet from the nearest pipeline or structure owned by a third party. There was no evidence that it could have been possible for the wreck to move such a distance once buried in the mud.

Conoco was initially concerned that the wreck of the vessel might interfere with moving the drilling rig that was then in place over the site of the sinking, and that the presence of the wreck might impede the placing of a platform over that location. The rig was moved without difficulty, and thereafter Conoco proceeded to remove the wreck and filed this suit to attempt to recover the cost of removal.

Henderson, Conoco's Division Manager for Production, was not concerned with potential liability to pipeline or vessel owners, but wanted to facilitate the placing of the platform. In-house counsel for Conoco said that "it could be contended that . . . if the vessel were to move over and strike the line I am sure Conoco would be sued on it, whether or not any ultimate liability would be there, I can't answer."

The majority has found that "the potential liability to third persons constituted the compulsion by law in the case, and, motivated Conoco, at least in part, to remove the 'Aqua Safari.'"

As it must, the majority concedes at the outset that "[t]here is no settled principle of law that would fix liability on Conoco if the Aqua Safari propelled by roiled storm waters from its resting place on Conoco's lease, had severed a pipeline." It recognizes that a non-negligent time charterer is not liable for damages due to the owner's fault. *Agrico-Chemical Co. v. M/V Ben W. Martin*, 664 F.2d 85 (5th Cir. 1981); *Mallard v. Aluminum Co. of Canada, Ltd.*, 634 F.2d 236, 242 n.5 (5th Cir.), *cert. denied*, 454 U.S. 816, 102 S.Ct. 93, 70 L.Ed.2d 85 (1981); *see St. Paul Fire & Marine Ins. v. Vest Transp.*, 666 F.2d 932 (5th Cir. 1982); *Tennessee Valley Sand & Gravel Co. v. M/V Delta*, 598 F.2d 930 (5th Cir. 1979), *modified per curiam on other grounds*, 604 F.2d 13 (5th Cir. 1979); *Lane v. United States*, 529 F.2d 175 (5th Cir. 1975); *United States v. Raven*, 500 F.2d 728 (5th Cir. 1974), *cert. denied*, 419 U.S. 1124, 95 S.Ct. 809, 42 L.Ed.2d 824; *In re Marine Leasing Services, Inc.*, 471 F.2d 255 (5th Cir. 1973). Nevertheless, in the face of this settled law, the majority holds that "[i]n the light of expanding concepts of enterprise and vicarious liability, Conoco faced a significant prospect of being held liable for damages should the Aqua Safari become a floating menace."

Not a single case is cited to support this unfounded statement. We are referred to *Prosser's Law of Torts* at 468 (4th Edition 1971), where the majority has omitted, in its opinion quotation, the author's preceding statement that, "[f]or the torts of an independent contractor ... it has long been said to be the general rule that there is no vicarious liability upon the employer" (footnotes omitted). The "contention" alluded to by the author, and cited by the majority, that the general rule should be, and probably will be, changed (a prediction that has borne no fruit in the eleven years since publication) is supported only by various law review articles, but no case law. I am not concerned with what law students say the law should be, or probably will be, but I am concerned when their views are cited to overturn what the law is, and has been for over one hundred years. *See The Clarita and The Clara*, 90 U.S. (23 Wall.) 1, 23 L.Ed. 146 (1874).

Nor can I subscribe to the majority's reliance on "policy reasons" to hold that Conoco might be liable if it had not removed the wreck. It is self-evident that Conoco chose Bonanza's services, and there is no suggestion that Bonanza was not wholly reliable (factors which seem to me to have no relevance in this case). Apparently based on this premise, the majority finds that Conoco "might have been negligent [in failing to remove the wreck] independent of Conoco's freedom from negligence in the sinking of the vessel." Policy reasons cannot override settled law.

In *Progress Marine, Inc. v. Foremost Insurance Co.*, 642 F.2d 816 (5th Cir.), *cert. denied*, 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1981), this Court construed the same SP–38 policy form. There Judge Brown aptly said that "removal occasioned by an unarticulated or unreasonable apprehension of ... civil liability could not be considered 'compelled by law.'" That should be enough to dispose of this case. In any event, the two-fold test set forth in *Progress Marine* that the assured is "reasonable [sic] ... exposed to liability by law sufficiently great to justify the expense of removal ...," and the assured is actually motivated by the legal compulsion, was not met. It is clear that Conoco faced no exposure whatever to legal liability, much less legal compulsion sufficient to justify removal. Conoco neither negligently nor intentionally placed the wreck in a position to be of danger to third persons and, accordingly, had no duty whatsoever to remove it. The fact that Conoco's house counsel said he was concerned about potential legal liability is of no moment because *Progress Marine* requires an *objective* potential of liability as well as a *subjective* fear of that liability.

Moreover, any liability that might be conjured up would not be the liability of Conoco as owner of the Safari, and thus would not be within the coverage of the policy which is very clearly limited to sums paid by the assured "as owner of the S/D Stand-By Vessel Aqua Safari." *See St. Paul Fire & Marine Ins. v. Vest Transp.*, 666 F.2d 932 (5th Cir. 1982); *Lanasse v. Travelers Insurance Company*, 450 F.2d 580 (5th Cir. 1971); *Wedlock v. Gulf Mississippi Marine Corp.*, 554 F.2d 240 (5th Cir. 1977). To transform Conoco from a time charterer with no control over the operation or navigation of the Safari to an owner of the vessel within the terms of the policy, the majority points to three factors. First, Conoco was responsible for having directed the Safari to be at the site of the sinking. Second, the Safari came to rest on Conoco's leasehold. Third, Conoco knew that Bonanza did not intend to raise the Safari. As a consequence, the majority holds that "Conoco was compelled by law to raise the wreck in the capacity 'as owner' of the Aqua Safari." This legal metamorphosis from a charterer to an owner is unsupported by precedent, and can only be brought about by judicial legerdemain.

I would reverse the judgment of the district court.[1]

## ON REHEARING AND REHEARING EN BANC

Before CLARK, Chief Judge, BROWN, GEE, RUBIN, REAVLEY, POLITZ, RAN-

1. The majority does not find it necessary to address the question of whether federal regulations also compelled removal of the wreck. The holding of the district court that the provision of the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331, and the regulation thereunder compelled the removal of the wreck by Conoco, and Conoco's argument in support of the holding are so meritless that discussion of this issue is not warranted.

My disposition of the case makes it unnecessary for me to reach the limitation of liability question.

DALL, TATE, JOHNSON, WILLIAMS, GARWOOD, JOLLY and HIGGINBOTHAM, Circuit Judges.

BY THE COURT:

A member of the Court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc,

IT IS ORDERED that the cause shall be reheard by the Court en banc without oral argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of supplemental briefs.