Stephen T. JONES, et al., Plaintiffs,

v.

SOUTHERN MARINE & AVIATION UNDERWRITERS, INC., et al., Defendants.

Civ. A. No. J87–0449(L).

United States District Court, S.D. Mississippi, Jackson Division.

Dec. 29, 1988.

Charles G. Copeland, Copeland, Cook, Taylor & Bush, Jackson, Miss., Bill Hyche, Rainer, Hyche & Toney, Brandon, Miss., for plaintiffs.

Walker W. Jones, III, Jackson, Miss., for defendants.

Winston Edward Rice, Rice, Fowler, Kingsmill, Vance & Flint, New Orleans, co-counsel, for Ins. Co.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

This cause is before the court on cross motions of plaintiffs, Steven T. Jones, et al, and defendants, Southern Marine Aviation Underwriters, Inc., et al, for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Each has re-

sponded to the motion of the other and the court has considered the memoranda of authorities together with attachments submitted by the parties.

This action is one of many lawsuits spawned by the July 15, 1985 blow-out of the E.N. Ross No. 2 gas well located in the Johns Field in Rankin County, Mississippi, and owned by Tomlinson Interests, Inc. (Tomlinson). The plaintiffs in this case were all residents of Rankin County who owned property in the vicinity of the E.N. Ross No. 2 gas well. Following the blow-out, suit was filed in Rankin County Circuit Court on behalf of these plaintiffs against Gary J. Knostman, as Trustee of the Estate in Bankruptcy of Tomlinson [1] and others seeking damages for bodily injury, property damage and loss of use of their property due to the escape of hydrogen sulfide and other toxic gases.[2] *Stephen T. Jones, et al. v. Halliburton Co., et al.*, Master Cause No. 15002. At the time of the blow-out, Tomlinson was insured under several insurance policies issued by Hartford Accident and Indemnity Company and Hartford Casualty Insurance Company (Hartford) which furnished comprehensive general liability coverage to Tomlinson. Tomlinson also had certain coverage under two certificates of insurance, numbers 35120 and 34595, which provided coverage for controlling the blow-out of the E.N. Ross No. 2 well and for redrill of a replacement well, respectively. Those certificates were procured and underwritten by the defendants in this case, Southern Marine and Aviation Underwriters, Inc. (SMAU), the entity responsible for procuring the insurance certificates, and groups of underwriters at Lloyds, London which subscribed to and underwrote the insurance coverage for Tomlinson evidenced by Certificate Nos. 35120 and 34595. These defendants will hereafter be referred to as the "underwriters" or "insurers."

After trial of plaintiffs' suit had commenced in Rankin County Circuit Court, Tomlinson entered into an agreed judgment on October 16, 1986 with the plaintiffs in the amount of $1,665,283. Hartford, as a liability insurer for Tomlinson, paid $1,065,283 toward satisfaction of the judgment leaving $600,000 unpaid.[3] On July 9, 1987, plaintiffs filed a suggestion for writ of garnishment in the Rankin County Circuit Court against the defendants seeking satisfaction of the outstanding balance of the agreed judgment. Upon petition by defendants dated August 7, 1987, the garnishment action was removed to this court and all parties now seek summary judgment.

■ Under Mississippi law, insurance policy proceeds are properly subject to garnishment. *Briggs v. Benjamin*, 467 So.2d 932, 934 (Miss.1985) (citing *American Nat'l Ins. Co. v. United States Fidelity and Guaranty Co.*, 215 So.2d 245 (Miss.1968)). The present garnishment action brought by plaintiffs is directed toward the two insurance certificates issued by the defendant insurance companies and underwriters at Lloyds, Certificate Nos. 35120 and 34595. Plaintiffs' motion relates only to Certificate No. 35120; they do not seek summary judgment as to Certificate No. 34595 since the proceeds under Certificate No. 35120, if coverage is available to plaintiffs, would satisfy their claims in full. Defendants have, however, moved separately for summary judgment on the issue of the availability of coverage under each of the certificates. Because the pertinent provisions of both certificates are identical and because the facts relevant to the issues presented by this motion are the same relative to both

---

1. Tomlinson filed for protection under the United States Bankruptcy Code in Texas in June 1984 following which the Trustee conducted all business affairs of Tomlinson, including the drilling of the E.N. Ross No. 2 well.

2. A number of separate lawsuits were filed but all were consolidated under master cause number 15,002 in Rankin County Circuit Court.

3. Hartford claimed that payment of the $1,065,283 exhausted the coverage available under its policies. Whether that is, in fact, the case is the subject of currently pending litigation in this court and in the Tomlinson bankruptcy proceedings. Additionally, plaintiffs have previously filed a garnishment suit against Hartford seeking satisfaction of the outstanding balance of $600,000. That action was stayed pending the outcome of the litigation between Tomlinson and Hartford.

certificates,[4] the court will consider the certificates collectively.

Section C of Certificate Nos. 35120 and 34595 applies to clean-up expenses and pollution insurance and provides in pertinent part as follows:

> Underwriters ... agree to indemnify the Assured against or pay on behalf of the Assured (a) All sums which the Assured shall by law ... be liable to pay ... as damages for bodily injury (fatal or nonfatal) and/or loss of, damage to or loss of use of property caused by or alleged to have been caused directly or indirectly by seepage, pollution or contamination arising from the wells insured ....

Plaintiffs urge that Section C plainly and unambiguously provides liability coverage to Tomlinson for damages covered by the agreed judgment and therefore, the proceeds of the policy are subject to garnishment to satisfy their outstanding judgment. Defendants, however, while admitting that the E.N. Ross No. 2 well was an insured well under Certificate Nos. 35120 and 34595, have advanced a variety of grounds upon which they contend plaintiffs' motion must be denied.

■■■■ Defendants first contend that Tomlinson, in securing coverage from the underwriters, never intended for the well control and redrill policies to provide coverage for the claims asserted by plaintiffs in the state court action. Rather, it was intended that the comprehensive general liability coverage furnished under Hartford's policies, and *not* defendants' policies, would provide coverage for the types of damages claimed by plaintiffs.[5] They reason, therefore, that to find coverage for plaintiffs' claims would impermissibly interfere with the intent of the contracting parties, Tomlinson and the defendants, by imposing an interpretation of the policy inconsistent with Tomlinson's intentions. Contrary to defendants' assertions, however, there is no need to "interpret" the policy or accept one interpretation over another since the policy itself is clear.[6] The coverage provided by Section C applies directly and unequivocally to the types of damages for which plaintiffs seek recovery.[7] In any event, even if Tomlinson, in securing Certificate Nos. 35120 and 34595, had not intended to procure the coverage specifically afforded by Section C, the policy nevertheless furnishes such coverage in plain and unambiguous terms. Thus, extrinsic evidence of Tomlinson's alleged intent will not be permitted to override clear policy terms. Nevertheless, summary judgment in favor of plaintiffs may not be granted.

■■■■ It is beyond cavil that judgment creditors such as plaintiffs, seeking to garnish insurance policy proceeds, enjoy no greater rights than the insured party. Thus, all defenses available to the insurer against its insured are available against third parties seeking coverage under the policy. Under the certificates at issue here, Tomlinson's compliance with a "due

---

4. In a separate motion for partial summary judgment, defendants contend that coverage under Certificate No. 34595, with the exception of redrill/replacement coverage, had expired prior to the July 15, 1985 blow-out of the E.N. Ross No. 2 well. The court's disposition of defendant's motion for summary judgment renders that issue moot.

5. According to defendants, Thomas Graves, Tomlinson's general counsel, was responsible for obtaining for Tomlinson any needed insurance coverage. After determining that Tomlinson needed coverage to control a potential well blow-out as well as comprehensive general liability coverage, Tomlinson, through its agents, sought and obtained well control coverage from the London market, *i.e.*, the underwriters, and the comprehensive general liability coverage from Hartford.

6. Where a contract is ambiguous, summary judgment is improper since the intent of the parties would be a genuine issue of material fact. *Freeman v. Continental Gin Co.,* 381 F.2d 459, 463 (5th Cir.1967). However, the preliminary issue of whether there is ambiguity is a question of law, not of fact, and is for the court to decide. *Id.*

7. Presumably, Tomlinson paid a premium to defendants to obtain that coverage and it is difficult to understand how, if Tomlinson had no intention of obtaining coverage against claims for damages resulting from pollution and contamination, the policy contains language purporting to cover that very risk, and further, why Tomlinson would pay a premium for something it did not want.

diligence" clause was made a condition of Tomlinson's insurance:

> Where the Assured is the operator of any insured well, the Assured will comply with all regulations, requirements and normal and customary practices in the trade in respect of utilizing Blow-out Preventors, Storm Chokes and other equipment to prevent the occurrence of and/or to minimize a loss insured hereunder....

Moreover, Section C, which is specifically applicable to plaintiffs' damages, contains the following:

> *EXCLUSIONS:*
>
> Insurance under this Section does not cover: d. Any claims arising directly or indirectly from seepage, pollution or contamination if such seepage, pollution, contamination ...
>
> (ii) results directly from any condition which with the prior knowledge of any managing or supervisory personnel of the Assured is in violation of or noncompliance with any governmental rule, regulation or law applicable thereto....

In their state court action, plaintiffs took the position that Tomlinson, its agents and employees knowingly violated the special field rules of Johns Field, the field in which the E.N. Ross No. 2 well was located, and that these violations proximately caused the blow-out. While the court need not detail each allegation of rule violations, the following are representative excerpts from the pretrial order in master cause number 15002:

> [T]here were numerous violations of the Johns Field Special Field Rules by Dan Pierce, Tomlinson, and others at the well which should be discussed because these violations ... contributed significantly to the size of the kick which occurred on June 21, 1985 and hampered efforts from that point forward to bring the well back under control.
>
> The Johns Field Special Field Rules were adopted by the Mississippi Oil and Gas Board on April 12, 1982 setting forth the requirements for wells to be drilled in the Johns Field because of the dangerous propensity of the gas encountered, etc.
>
> Dan Pierce testified that he never read the Johns Field Special Field Rules prior to drilling this well, although he said he was aware of the contents of everything that went into the rules. He admitted that he had not complied with the special field rules....
>
> The Tomlinson drilling program for the well did not require that 3½" rams should be in place, that a trip tank should be on location, or that safety drills should be conducted on a weekly basis, all as provided in the field rules.
>
> There were several other provisions of the Johns Field Special Field Rules which were violated such as the requirement that the well-head assembly include an "automatic safety shutoff valve that automatically closes in the well if flow line pressures drop indicating a rupture in the flow line."
>
> The failure to have the remote control valve in place also constituted another violation of the Johns Field Special Field Rules....
>
> Had the Haliburton SG–15 remote control valve been on the well on the night of July 15, 1985, it would have closed in the well and prevented a blow-out.

Whether there were any violations and whether the alleged violations of the special field rules of Johns Field by Tomlinson were proximate causes of the blow-out were issues not litigated on the merits to a final decision in the state court action; the agreed judgment was executed and terminated the state court litigation prior to an adjudication of the merits. However, if plaintiffs' previous allegations were to be proven, then under the language of the certificates and specifically, the exclusion set forth in Section C, there would be no coverage for plaintiffs' claims. Since resolution of that issue involves disputed issues of fact, summary judgment may not be entered for plaintiffs.

■ The court does recognize plaintiffs' contention that defendants should be estopped from asserting any alleged noncompliance by Tomlinson with the field rules to defeat plaintiffs' claims since defendants made payments to Tomlinson under other

policy provisions without raising any defense.[8] That is, plaintiffs urge that defendants should be held to have waived this defense as to them since they have not held Tomlinson to the policy condition of due diligence. In *Southern Farm Bureau Casualty Insurance Company v. Logan*, 238 Miss. 580, 119 So.2d 268 (1960), the court held that

> where the injured person is expressly or impliedly given a right of action against the insurer under, and in accordance with, the terms of the policy, the injured person has the same rights as insured would have had if he had paid the judgment, or he has the benefit of any estoppel or waiver which operates in favor of the insured.

*Logan*, 119 So.2d at 272. Any waiver of the due diligence requirement toward Tomlinson, plaintiffs argue, should be construed as a waiver of any defense involving the due diligence clause toward the plaintiffs. However, even if defendants have waived the due diligence condition as to Tomlinson, there remains the specific exclusion from coverage in Section C. In the court's view, waiver of a condition of coverage as to an insured should not preclude the insurer from relying on an exclusion from coverage for claims made by the injured party.

█ █ Defendants, in support of their cross motion for summary judgment, submit that plaintiffs have no standing to bring suit to recover against the certificates since each is a policy of indemnity against loss actually sustained, *i.e.*, an indemnity policy, rather than one indemnifying against a liability, *i.e.*, a liability policy. As defendants correctly observe, a distinction is drawn between the two types of coverage:

> In a liability contract, the insurer agrees to cover *liability* for damages. If the insured is liable, the insurance company must pay the damages. In an indemnity contract, by contrast, the insurer agrees to reimburse expenses to the insured that the insured is liable to pay and has

paid. An indemnity policy covers only the insured's actual expenses.

*Continental Oil Co. v. Bonanza Corp.*, 677 F.2d 455, 459 (5th Cir.1982). The significance of this distinction in the case *sub judice* concerns the propriety of a garnishment action. Unlike a liability policy which may be garnished, a policy indemnifying against loss actually sustained and thus providing for reimbursement for monies paid out-of-pocket is not subject to garnishment by an injured third person who has recovered a judgment on a claim. *Commercial Casualty Ins. Co. v. Skinner*, 190 Miss. 533, 1 So.2d 225 (1941). This is because

> [t]he insured on an indemnity contract may not bring an action against the insurance company until the insured has actually paid money on his liability. *Stuyvesant Insurance Company v. Nardelli*, 286 F.2d 600 (5th Cir.1961). If the insured cannot enforce his own indemnity policy until having paid out money, it follows that the insurance company has no greater obligation to the person to whom the insured is liable.

*Continental*, 677 F.2d at 459–60.

█ In support of their contention that Certificate Nos. 35120 and 34595 are contracts of indemnity and not liability contracts, defendants have submitted the affidavits of Thomas W. Graves and Jerry L. Shelton, General Counsel for Tomlinson and Vice President of SMAU, respectively, both of whom opine that the certificates are indemnity policies as they are intended to indemnify and to reimburse the assured for amounts actually paid. However, the class under which a particular policy falls depends upon the intention of the parties, as evinced by the phraseology of the agreement in such respect in the policy. 43 Am.Jur.2d *Insurance* § 717, at 771 (1982). It is a legal determination based on the policy language.

Section A of both certificates providing coverage to Tomlinson for well control, is

---

**8.** It is undisputed that the underwriters made payments to Tomlinson under the well control coverage of Certificate No. 35120 even after they were aware of these plaintiffs' allegations that Tomlinson had violated the Johns Field Special Field Rules.

unquestionably intended to indemnify against actual loss sustained inasmuch as the underwriters agreed "to reimburse the Assured for actual costs and/or expenses incurred by the Assured" in regaining control of the well, extinguishing fire from the well and for removal of wreckage and/or debris resulting from an insured loss. Similarly, Section B of Certificate No. 34595 obligates the underwriters to "reimburse the assured for actual costs and/or expenses incurred" in redrilling, recompletion and other salvage operations. The coverage statement in Section C, the pertinent section from plaintiffs' perspective, differs significantly:

> Underwriters ... agree to indemnify the Assured against or *pay on behalf of the Assured:*
> A. *All sums which the Assured shall by law ... be liable to pay ... as damages* for bodily injury (fatal or nonfatal) and/or loss or damage to loss of use of property caused by or alleged to have been caused directly or indirectly by seepage, pollution or contamination arising from [insured wells].... (emphasis supplied).

This language, providing for payment "on behalf of" an insured, necessarily presupposes that the insured has itself paid no monies. Moreover, coverage is afforded for sums which the insured shall "be liable to pay...." Again, coverage is not defined in terms of what the assured has already paid but in terms of what it is liable to pay. In the court's opinion, the only reasonable conclusion to be drawn from the coverage provision of Section C is that the underwriters contracted to provide coverage against liability, not merely to indemnify against loss actually paid by the insured.[9] Consequently, plaintiffs are not precluded from attempting to garnish the proceeds of the certificates on the ground that the policies are indemnity contracts.

■ Another ground raised by defendants to prohibit plaintiffs' recovery under the policy derives from the terms of the agreed judgment entered between plaintiffs and Tomlinson. The judgment contains the following:

> [I]t is agreed by all parties herein and it is hereby ordered by the court that this agreed judgment shall not constitute a lien or encumbrance against the Estate in Bankruptcy of Tomlinson Interests, Inc., Gary J. Knostman (individually or as trustee of said estate) but shall constitute only a lien and encumbrance against any insurance coverages available to said defendants which are applicable to the claims made in these causes for which execution, garnishment and other legal process may issue.

Defendants reason that since Tomlinson, under the terms of the agreed judgment, was relieved of all personal liability to plaintiffs, plaintiffs are precluded from recovery by garnishment since under the certificates the underwriters are not liable unless their insured, Tomlinson, is liable.

Recently, the District Court for the Northern District of Mississippi addressed a similar contention and concluded that an insurer had no obligation to pay an injured third party when a stipulation released the insured from liability for the judgment. *See Putman v. Ins. Co. of North America,* 673 F.Supp. 171 (N.D.Miss.1987), *aff'd,* 845 F.2d 1020 (5th Cir.1988).[10] In *Putman,* the

---

**9.** In the pretrial order in state court, plaintiffs' statement of facts contains the following recitation: "As is typical of well control policies, the policy in question was an indemnity policy meaning that Lloyds of London was not willing to pay for the loss "out-of-pocket" ... They merely agreed to pay for a replacement well in the event it was drilled by Tomlinson which would be the equivalent of the Ross No. 1 well...." When considered in the context in which it was made, this statement represents nothing more than an assessment of the indemnity nature of the well control and redrill/replacement coverage of the policies which, as the court has already recognized, were undeniably intended to indemnity against actual loss. In contrast, the nature of the coverage afforded under Section C is clearly liability coverage.

**10.** On appeal, in an unpublished opinion, the Fifth Circuit affirmed the district court's holding that the insurer had no liability to the injured party, but did so on other grounds. It specifically did not reach the issue of whether INA's duty to pay was extinguished by the stipulation agreement in the state action. *Putman v. Insurance Co. of North America,* 845 F.2d 1020 (5th Cir.1988).

defendant insureds entered into a stipulation of settlement in a state court action under which they admitted liability and assigned to the third-party claimants all benefits under a $100,000 automobile insurance policy held by defendants and also assigned to them any other benefits which might accrue under any other liability policy, including a fifteen million dollar excess blanket liability policy issued by the Insurance Company of North America (INA). In return, the Putmans, the injured third parties, stipulated that a judgment in excess of $100,000 would not

> operate as a lien against any personal property of the Defendants or in any manner be enforceable against the personal property, real property or any other type of asset owned by any of the Defendants with the sole exception of any other liability policies such as might apply providing liability coverage for this incident including but not limited to [the] INA policy....

*Putman*, 673 F.Supp. at 174. The INA policy required INA to pay "the sum actually paid or payable in cash for the settlement or satisfaction of losses for which the insured is liable...." *Id.* In a subsequent suit brought by the Putmans against INA seeking recovery on the policy, the district court concluded that

> [i]n the absence of a breach of the duty to defend, the insurer is free to take refuge in the language of the contract. The contract here obligates INA to pay those sums "payable in cash ... for which the *insured* is liable." The language plainly states that [the insured] must be personally liable before INA has any obligation to pay. The stipulation creates no liability for [the insured]. Consequently, INA has no obligation to pay under the stipulation.

*Id.*, 673 F.Supp. at 177.

Just as did the stipulation in *Putman*, the agreed judgment in the case at bar released Tomlinson from any personal liability. Moreover, the underwriters' policy, like the INA policy in *Putman*, requires personal liability of the insured before there exists an obligation to pay. Applica-

bility of the rule stated in *Putman*, though, was conditioned upon the insurer's compliance with its defense obligations to its insured. In a similar case, where an insurer wrongfully refused to defend its insured, a stipulation relieving the insured of personal liability was held not to relieve the insurer's liability under its policy. In *Coblentz v. American Surety Company of New York*, 416 F.2d 1059 (5th Cir.1969), judgment creditors attempted to garnish the proceeds of a liability insurance policy. The insurer, American Surety, had previously refused to defend its insured in a state court action brought by injured third parties. In a settlement agreement between the plaintiffs and the defendant/insured in that action, it was stipulated that

> this judgment may only be satisfied from public liability insurance policies in force at the time of the incident complained of and this judgment is not satisfiable nor [may it] be a lien upon any other assets of the defendant....

*Coblentz*, 416 F.2d at 1062. In the subsequent garnishment action, the district court observed that "the final judgments entered by the state court were not within the coverage of the insurance policy because they did not legally obligate the insured to pay any sum or sums of money." *Id.* On appeal, the Fifth Circuit reversed and stated that

> [b]ecause American Surety refused to handle his defense, Carbone [its insured] was left to his own resources. It was certainly in his best interest to consent to the entry of a judgment that could be satisfied only from public liability insurance policies covering him at the time of the incident rather than from his own personal assets.

*Id.* at 1063. Rejecting the insurer's contention that it was under no obligation to satisfy the judgment since the judgment did not legally obligate its insured to pay anything, the court recited the

> well-established principle that where a person is responsible over to another, either by operation of law or express contract, and he is duly notified of the pendency of the suit against the person to whom he is liable over, and full oppor-

tunity is afforded him to defend the action, the judgment, if obtained without fraud or collusion, will be conclusive against him, whether he appeared or not. *Id.*, quoting 27 Am.Jur. *Indemnity*, § 35, at 478. The court concluded that since the insurer had notice of the lawsuit against its insured, yet elected to leave him to his own defense, and since the judgment on which the garnishment action was based was not tainted by fraud or collusion, the insurer was liable on the debt.

In the case at bar, the underwriters do not claim that the state court agreed judgment was fraudulently or collusively obtained. They do not dispute that they had notice of the pendency of the lawsuit against Tomlinson, their insured, and in fact, that their legal representative was present not only at trial but also at the pretrial conference held in that cause. There is an issue, however, of whether the underwriters were afforded "full opportunity" to defend the action, or perhaps more succinctly, whether the underwriters breached a duty to defend.[11] In this regard, the court finds it significant that Tomlinson never made claims against Certificate No. 35120 or 34595 for the damages sought by plaintiffs and never requested that the underwriters provide a defense under either of the certificates. Instead, Tomlinson sought coverage from Hartford.

■ It has been said that there is no duty to defend if the insured fails to tender the suit to its insurer for defense. 14 G. Couch, *Cyclopedia of Insurance Law*, § 51.35, at 444 (2d ed.1982). This principle is not without exception, however. In *State Farm Mutual Automobile Ins. Co. v. Universal Underwriters Ins. Co.*, 601 F.Supp. 286, 290 (S.D.Miss.1984), this court held that an insurer upon whom there had been no demand to defend could nevertheless incur liability where it had notice of an event potentially within coverage of its policy and of its legal responsibility to defend. In that case, though, the insurer was notified of the accident and had on at least two

occasions denied coverage to its insured. *State Farm*, 601 F.Supp. at 290. *Compare Detroit Automobile Inter–Insurance Exchange v. Higginbotham*, 95 Mich.App. 213, 290 N.W.2d 414, 417 (Mich.Ct.App. 1980) (absent request, insurer has no duty to defend insured); *Manny v. Estate of Anderson*, 117 Ariz. 548, 574 P.2d 36, 38 (Ariz.Ct.App.1977) (no defense obligation until complaint presented to insurer; though insurer denied coverage three times, no breach of defense where insurer did not clearly indicate unwillingness to defend).

■ In the court's opinion, a request for coverage by an insured implicitly carries with it a request that the insurer fulfill all duties to its insured, including any duty to defend. In the present case, not only was there no request by Tomlinson of a defense to be provided by defendants, there was no claim by Tomlinson, Hartford or these plaintiffs that the underwriters' coverage was implicated by plaintiffs' claims. Instead, Tomlinson directed all of plaintiffs' claims to Hartford as Tomlinson's comprehensive general liability carrier and Hartford provided Tomlinson's defense in the state court action. All parties were apparently operating under the impression that Hartford was the insurer responsible for Tomlinson's liability to plaintiffs and the defense of Tomlinson. Tomlinson, at least, should have been aware of its coverage. Under the circumstances, the underwriters could not reasonably have been expected to provide a defense to their insured.

■ These defendants clearly never indicated an unwillingness to defend Tomlinson and thus did not "refuse" to defend in the usual sense of that term. Yet even had defendants refused to defend, such refusal would not have been wrongful and would not have amounted to any breach of their defense obligations under the circumstances. An insurer's defense obligation has been consistently held to be broader than its duty to pay; the extent of the duty

---

11. Ordinarily, whether an insurer has fulfilled or breached a duty to defend its insured is not a relevant issue in subsequent attempts by third parties to garnish policy proceeds. Here, the language of the agreed judgment requires this inquiry.

to defend "depends upon the pleaded theories upon which plaintiff announces ready for trial." 7C J. Appleman, *Insurance Law and Practice* § 4684, at 86 (1979). And, if a plaintiff's allegations against an insured are unequivocal with regard to claiming injury or damages caused by acts which, if proved, would place his claim within an exclusion from coverage, there is no duty to defend. *See ABC Distributing, Inc. v. Lumbermans Mutual Ins. Co.,* 646 F.2d 207, 209 (5th Cir.1981) (no duty to defend where complaint alleged intentional acts by insured and policy excluded intentional injuries); *Ladner & Co., Inc. v. Southern Guaranty Ins. Co.,* 347 So.2d 100 (Ala.1977) (no duty to defend where plaintiffs charged intentional acts and policy covered only accidents even though insured denied acts were intentional); *see also* 7C J. Appleman, § 4684.01, at 89 (no duty to defend if allegations bring action clearly within an exclusion and outside coverage of policy). Here, plaintiffs' state court allegations concerning Tomlinson's alleged knowing violations of the Johns Field Special Field Rules as the proximate cause of the blow-out and resulting damage unequivocally placed plaintiffs' claims squarely within an exclusion from coverage. Hence, the underwriters, even if requested by Tomlinson, would not have been required to provide a defense to the suit.

Because there was no failure by defendants to comply with any defense obligations imposed by the policy, the defendants may "take refuge" in the policy requirement that Tomlinson be personally liable before the insurers incur liability. Thus, since the terms of the agreed judgment placed on Tomlinson no personal liability, the defendants are likewise relieved of any liability to plaintiffs.[12]

Both plaintiffs and defendants have requested the imposition of sanctions against the other, plaintiffs claiming that defendants had absolutely no defense to pay-

ment and defendants contending that plaintiffs' efforts toward obtaining payment were baseless and frivolous. The court is unable to agree with either argument. Neither side's position was unreasonable or completely lacking in foundation and in the court's view, the only "frivolous" argument by either side is the argument that the court should impose sanctions.

Accordingly, plaintiffs' motion for summary judgment is denied and defendants' motion for summary judgment granted and all requests for sanctions are denied.

A separate judgment shall be entered in accordance with Federal Rule of Civil Procedure 58.

ORDERED.

---

**12.** The court would note that in the present case, unlike *Coblentz,* the insured was not left to its own resources. Hartford defended Tomlinson against plaintiffs' claims throughout the state court proceedings. While the fact of Hartford's having defended the suit would not have

relieved these defendants of any duty to defend had such duty arisen, *see Couch,* § 51.35 (all insurers providing primary coverage are duty bound to defend insured), Tomlinson's interests were adequately represented.